No. 20-12107

In the United States Court of Appeals
for the Eleventh Circuit

INDEPENDENT PARTY OF FLORIDA and
PARTY FOR SOCIALISM AND LIBERATION,
*Plaintiffs/Appellants*,

v.

LAUREL M. LEE,
Florida Secretary of State, in her official capacity,
*Defendant/Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF FLORIDA
CASE NO.: 4:20-cv-00110-MW-CAS

**APPELLEE'S SUPPLEMENTAL APPENDIX**

ASHLEY E. DAVIS
*Deputy General Counsel*
Florida Bar No.: 48032
Ashley.Davis@DOS.myflorida.com

FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 South Bronough Street, Suite 100
Tallahassee, FL 32399
(850) 245-6536 telephone
(850) 245-6127 facsimile

*Counsel for Defendant/Appellant*
*Florida Secretary of State*

## INDEX OF APPENDIX

**DOCUMENT**                                                    **TAB**

District Court Docket Sheet.................................................................... A

Motion for Preliminary
Injunction......................................................................................... 9

Secretary's Response in Opposition
to Motion for Preliminary
Injunction......................................................................................... 34

Reply in Support of Motion for Preliminary
Injunction......................................................................................... 35


Transcript of Preliminary Injunction
Hearing............................................................................................. B

Certificate of Service………………………………………………...... C

Tab A

APPEAL

## U.S. District Court
## Northern District of Florida (Tallahassee)
## CIVIL DOCKET FOR CASE #: 4:20-cv-00110-MW-MAF

INDEPENDENT PARTY OF FLORIDA et al v. LEE
Assigned to: CHIEF JUDGE MARK E WALKER
Referred to: MAGISTRATE JUDGE MARTIN A
FITZPATRICK
Demand: $0
Cause: 42:1983 Civil Rights Act

Date Filed: 02/24/2020
Jury Demand: None
Nature of Suit: 441 Civil Rights: Voting
Jurisdiction: Federal Question

**Plaintiff**

**INDEPENDENT PARTY OF
FLORIDA**

represented by **DANIEL J TREUDEN**
THE BERNHOFT LAW FIRM SC -
AUSTIN TX
1402 E CESAR CHAVEZ STREET
AUSTIN, TX 78702
512-582-2100
Fax: 512-373-3159
Email: djtreuden@bernhoftlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PARTY FOR SOCIALISM AND
LIBERATION**

represented by **DANIEL J TREUDEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**LAUREL M LEE**
*SECRETARY OF STATE IN HER
OFFICIAL CAPACITY*

represented by **ASHLEY E DAVIS**
FLORIDA DEPARTMENT OF STATE
RA GRAY BUILDING
500 SOUTH BRONOUGH STREET
SUITE 100
TALLAHASSEE, FL 32399
850-245-6531
Email:
ashley.davis@dos.myflorida.com
*ATTORNEY TO BE NOTICED*

**BRADLEY ROBERT MCVAY**
FLORIDA DEPARTMENT OF STATE
OFFICE OF GENERAL COUNSEL

500 S BRONOUGH STREET
TALLAHASSEE, FL 32399
352-219-5195
Email: brad.mcvay@dos.myflorida.com
*ATTORNEY TO BE NOTICED*

**COLLEEN E O'BRIEN**
FLORIDA DEPARTMENT OF STATE
500 S BRONOUGH STREET
SUITE 100
TALLAHASSEE, FL 32399
850-245-6519
Email:
colleen.obrien@dos.myflorida.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/24/2020 | 1 | COMPLAINT against LAUREL M LEE ( Filing fee $ 400 receipt number AFLNDC-4893869.), filed by THE INDEPENDENT PARTY OF FLORIDA, THE PARTY FOR SOCIALISM AND LIBERATION. (Attachments: # 1 Summons) (TREUDEN, DANIEL) (Entered: 02/24/2020) |
| 02/24/2020 | 2 | CIVIL COVER SHEET. (TREUDEN, DANIEL) (Entered: 02/24/2020) |
| 02/24/2020 | 3 | MOTION to Appear Pro Hac Vice by Daniel J. Treuden.( Filing fee $ 201 receipt number AFLNDC-4893879.) by THE INDEPENDENT PARTY OF FLORIDA, THE PARTY FOR SOCIALISM AND LIBERATION. (Attachments: # 1 Certificate of Good Standing) (TREUDEN, DANIEL) (Entered: 02/24/2020) |
| 02/25/2020 | 4 | DOCKET ANNOTATION BY COURT: Attorney TREUDEN Re 1 COMPLAINT- Counsel is advised by this entry, for future case openings: Please review the procedures in the "Style Guide for Electronic Case Filing" and/or Chapter 10 of the "CM/ECF Attorney User's Guide", (both available on the clerk's website) SPECIFICALLY IN REGARDS TO PARTIES NAMES INCLUDING "THE". (blb) (Entered: 02/25/2020) |
| 02/25/2020 | 5 | Summons Issued as to LAUREL M LEE. (blb) (Entered: 02/25/2020) |
| 02/25/2020 | 6 | ORDER GRANTING LEAVE TO APPEAR PRO HAC VICE. Daniel J. Treuden moves this Court for leave to appear pro hac vice. ECF No. 3 . He has fulfilled the requirements of this Court's Local Rules to appear in that capacity. Accordingly, the motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 2/25/20. (blb) (Entered: 02/25/2020) |
| 03/09/2020 | 7 | NOTICE of Appearance by ASHLEY E DAVIS on behalf of LAUREL M LEE (DAVIS, ASHLEY) (Entered: 03/09/2020) |
| 03/27/2020 | 8 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by LAUREL M LEE. (DAVIS, ASHLEY) (Entered: 03/27/2020) |
| 04/03/2020 | 10 | |

| | | |
|---|---|---|
| | | ORDER REASSIGNING CASE. Case reassigned to MAGISTRATE JUDGE MARTIN A FITZPATRICK for all further proceedings. MAGISTRATE JUDGE CHARLES A STAMPELOS no longer assigned to case. Signed by CHIEF JUDGE MARK E WALKER on 4/3/2020. **Please use the new judge's initials for all future filings: 4:20cv110-MW/MAF. (amm) (Entered: 04/07/2020) |
| 04/06/2020 | 9 | MOTION for Preliminary Injunction by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION. (Attachments: # 1 Declaration of Richard Winger, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Richard Winger Curriculum Vitae, # 7 Declaration of Ernest Bach, # 8 Declaration of Bryan Ellis) (TREUDEN, DANIEL) (Entered: 04/06/2020) |
| 04/07/2020 | 11 | ORDER SETTING CONFERENCE SCHEDULE. TELEPHONIC Scheduling Conference set for **4/13/2020 02:15 PM** before CHIEF JUDGE MARK E WALKER. Signed by CHIEF JUDGE MARK E WALKER on 4/7/20. (blb) (Entered: 04/07/2020) |
| 04/07/2020 | 12 | INITIAL SCHEDULING ORDER : Rule 26 Meeting Report due by **5/21/2020**. Discovery due by **8/5/2020**. Status Report due by **5/7/2020**. Signed by CHIEF JUDGE MARK E WALKER on 4/7/20. (blb) (Entered: 04/07/2020) |
| 04/08/2020 | 13 | NOTICE OF TELEPHONIC HEARING: Telephonic Scheduling Conference set for **4/13/2020 02:15 PM** before CHIEF JUDGE MARK E WALKER. ALL PARTIES are directed to call the AT&T Conference Line (see below) Conference Call Information You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. The Court also asks that counsel NOT use cell phones or speaker phones during the call as the quality of the audio connection is comprised by these devices. NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as a hearing impairment, please contact Victoria Milton McGee at 850-521-3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made. s/ Victoria Milton McGee Courtroom Deputy Clerk (vkm) (Entered: 04/08/2020) |
| 04/09/2020 | 14 | NOTICE of Appearance by BRADLEY ROBERT MCVAY on behalf of LAUREL M LEE (MCVAY, BRADLEY) (Entered: 04/09/2020) |
| 04/10/2020 | 15 | RESPONSE in Opposition re 8 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION. (TREUDEN, DANIEL) (Entered: 04/10/2020) |

| 04/13/2020 | 16 | ORDER SETTING HEARING AND BRIEFING SCHEDULE ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION. Plaintiffs have filed a Motion for Preliminary Injunction challenging certain provisions of section 103.021(4), Florida Statues. ECF No. 9 . Defendant shall file her response to Plaintiffs' Motion and any supporting documents on or before 5/22/2020). Plaintiffs may file a reply, if any, to Defendant's response on or before 5/29/2020. The Clerk shall set a TELEPHONIC hearing on Plaintiffs' Motion for Preliminary Injunction for 6/5/2020 09:00 AM. Signed by CHIEF JUDGE MARK E WALKER on 4/13/20. (blb) (Entered: 04/13/2020) |
|---|---|---|
| 04/13/2020 | 17 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Scheduling Conference held on 4/13/2020. Parties discuss case status and schedule. Ruling by Court: Video teleconference Preliminary Injunction hearing scheduled for 6/5/20 at 9:00 a.m. Counsel to notify Clerk 10 days before the hearing if they can appear in person. Plaintiff's Declarations/expert report or other documents in support due by 4/23/2020. Defendants response/declarations or other documents in opposition due by 5/22/20; Plaintiffs reply due by 5/29/20. Order to follow (Court Reporter Megan Hague). (vkm) (Entered: 04/14/2020) |
| 04/14/2020 | 18 | NOTICE OF TELEPHONIC HEARING RE: 9 MOTION for Preliminary Injunction: Telephonic Motion Hearing set for 6/5/2020 09:00 AM before CHIEF JUDGE MARK E WALKER.

ALL PARTIES are directed to call the AT&T Conference Line (see below)

Conference Call Information

You may dial into the conference call up to five minutes before start time. Call in number: 888-684-8852 When prompted for an access code, enter: 3853136# If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: 4565# Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. The Court also asks that counsel NOT use cell phones or speaker phones during the call as the quality of the audio connection is comprised by these devices.

NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as a hearing impairment, please contact Victoria Milton McGee at 850-521-3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made.

s/ Victoria Milton McGee
Courtroom Deputy Clerk (vkm) (Entered: 04/14/2020) |
| 04/20/2020 | 19 | Corporate Disclosure Statement/Certificate of Interested Persons by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION. (TREUDEN, DANIEL) (Entered: 04/20/2020) |
| 04/23/2020 | 20 | NOTICE *of Filing of Additional Evidence in Support of Motion for Preliminary Injunction* by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION re 9 MOTION for Preliminary Injunction |

| | | (Attachments: # 1 Supplemental Declaration of Richard Winger, # 2 Corrected Declaration of Ernest Wm. Bach) (TREUDEN, DANIEL) (Entered: 04/23/2020) |
|---|---|---|
| 04/27/2020 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 17 Scheduling Conference Deadline. Plaintiff's Declarations/expert report or other documents in support was due by 4/23/2020. (blb) (Entered: 04/27/2020) |
| 04/30/2020 | 21 | ORDER REQUIRING SUPPLEMENTAL BRIEFING. Plaintiffs are ordered to file a supplemental brief that addresses the issue of whether, in light of Jacobson, they have standing. Plaintiffs' brief must specifically address the issue of whether their injury is traceable and redressable by Defendant. Plaintiffs shall file their brief on or before **5/11/2020**. Defendant shall file a response on or before **5/21/2020**. Signed by CHIEF JUDGE MARK E WALKER on 4/30/20. (blb) (Entered: 04/30/2020) |
| 05/07/2020 | 22 | STATUS REPORT *Regarding Discovery* by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION. (TREUDEN, DANIEL) (Entered: 05/07/2020) |
| 05/08/2020 | | Set/Reset Deadlines: Status Report due by **6/8/2020**. (blb) (Entered: 05/08/2020) |
| 05/11/2020 | 23 | MEMORANDUM in Support re 9 MOTION for Preliminary Injunction *Supplemental Brief filed Pursuant to Court's April 30, 2020 Order* filed by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION. (TREUDEN, DANIEL) (Entered: 05/11/2020) |
| 05/11/2020 | 24 | RULE 26 Disclosures by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION. (TREUDEN, DANIEL) (Entered: 05/11/2020) |
| 05/11/2020 | 25 | RULE 26 Disclosures by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION. (TREUDEN, DANIEL) (Entered: 05/11/2020) |
| 05/11/2020 | 26 | RULE 26 Disclosures by LAUREL M LEE. (DAVIS, ASHLEY) (Entered: 05/11/2020) |
| 05/11/2020 | 27 | REPORT of Rule 26(f) Planning Meeting. (TREUDEN, DANIEL) (Entered: 05/11/2020) |
| 05/12/2020 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 27 Report of Rule 26(f) Planning Meeting (blb) (Entered: 05/12/2020) |
| 05/12/2020 | 28 | SCHEDULING ORDER Re: 27 Report of Rule 26(f) Planning Meeting : Discovery due by **10/15/2020**. Dispositive Motions to be filed by **11/16/2020**. Bench Trial set for **3/15/2021 08:15 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. Signed by CHIEF JUDGE MARK E WALKER on 5/12/20. (blb) (Entered: 05/12/2020) |
| 05/21/2020 | 29 | SUPPLEMENTAL BRIEF ON STANDING by LAUREL M LEE re 21 Order . (DAVIS, ASHLEY) Modified Title on 5/22/2020 (blb). (Entered: 05/21/2020) |

| 05/22/2020 | 30 | ORDER ACKNOWLEDING SUPPLEMENTAL BRIEFING. Signed by CHIEF JUDGE MARK E WALKER on 5/22/20. (blb) (Entered: 05/22/2020) |
|---|---|---|
| 05/22/2020 | 31 | NOTICE of Appearance by COLLEEN E O'BRIEN on behalf of LAUREL M LEE (O'BRIEN, COLLEEN) (Entered: 05/22/2020) |
| 05/22/2020 | 32 | NOTICE OF TELEPHONIC HEARING RE: 9 MOTION for Preliminary Injunction: Telephonic Motion Hearing set for **6/5/2020 09:00 AM** before CHIEF JUDGE MARK E WALKER.

ALL PARTIES are directed to call the AT&T Conference Line (see below)

Conference Call Information

You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. The Court also asks that counsel NOT use cell phones or speaker phones during the call as the quality of the audio connection is comprised by these devices.

NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as a hearing impairment, please contact Victoria Milton McGee at 850-521-3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made.

s/ Victoria Milton McGee
Courtroom Deputy Clerk (vkm) (Entered: 05/22/2020) |
| 05/22/2020 | 33 | Judicial Notice by LAUREL M LEE. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit) (DAVIS, ASHLEY) (Entered: 05/22/2020) |
| 05/22/2020 | 34 | RESPONSE in Opposition re 9 MOTION for Preliminary Injunction filed by LAUREL M LEE. (Attachments: # 1 Exhibit) (DAVIS, ASHLEY) (Entered: 05/22/2020) |
| 05/29/2020 | 35 | REPLY to Response to Motion re 9 MOTION for Preliminary Injunction filed by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION. (Attachments: # 1 Declaration of Richard Winger, # 2 Declaration of Ernest Bach, # 3 Declaration of Bryan Ellis, # 4 Exhibit A, # 5 Exhibit B) (TREUDEN, DANIEL) (Entered: 05/29/2020) |
| 06/05/2020 | 36 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Motion Hearing held on 6/5/2020 re 9 MOTION for Preliminary Injunction. Court hears argument from both sides. Order to follow (Court Reporter Megan Hague). (vkm) (Entered: 06/05/2020) |
| 06/08/2020 | 37 | ORDER DENYING DEFENDANT'S MOTION TO DISMISS 8 . Signed by CHIEF JUDGE MARK E WALKER on 6/8/20. (blb) (Entered: 06/08/2020) |

| 06/08/2020 | 38 | STATUS REPORT *Joint Status Report Regarding Discovery* by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION. (TREUDEN, DANIEL) (Entered: 06/08/2020) |
|---|---|---|
| 06/08/2020 | 39 | ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION. Plaintiffs' Motion for Preliminary Injunction, ECF No. 9 , is therefore DENIED. Signed by CHIEF JUDGE MARK E WALKER on 6/8/2020. (kjw) (Entered: 06/08/2020) |
| 06/08/2020 | 40 | NOTICE OF APPEAL as to 39 Order on Motion for Preliminary Injunction by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION. ( Filing fee $505 Receipt Number AFLNDC-5318888.) Certificate of Readiness (FRAP 11) due by **6/22/2020**. Transcript due by **6/22/2020**. (TREUDEN, DANIEL) (Entered: 06/08/2020) |
| 06/09/2020 |  | Set/Reset Deadlines: Status Report due by **7/9/2020**. (blb) (Entered: 06/09/2020) |
| 06/09/2020 | 41 | Appeal Instructions re: 40 Notice of Appeal, : The Transcript Request Form is available on the Internet at http://www.flnd.uscourts.gov/forms/Attorney/ECCA_transcript_form_fillable.pdf **PLEASE NOTE** Separate forms must be filed for each court reporter. Transcript Order Form due by **6/23/2020**. (blb) (Entered: 06/09/2020) |
| 06/09/2020 | 42 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 40 Notice of Appeal. (blb) (Entered: 06/09/2020) |
| 06/09/2020 |  | Set Deadlines re 40 Notice of Appeal : Clerk to check status of Appeal on **9/9/2020**. Certificate of Readiness (FRAP 11) due by **6/23/2020**. (blb) (Entered: 06/09/2020) |
| 06/09/2020 | 43 | TRANSCRIPT REQUEST by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION for proceedings held on June 5, 2020 before Judge Mark E. Walker, re 40 Notice of Appeal, Court Reporter:Megan Hague Transcript due by **6/23/2020**. (Attachments: # 1 Certificate of Service) (TREUDEN, DANIEL) (Entered: 06/09/2020) |
| 06/10/2020 | 44 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of telephonic preliminary injunction Proceedings held on 6/5/2020, before Judge Mark E. Walker. Court Reporter/Transcriber Megan A. Hague, Telephone number 850-422-0011. *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* Redaction Request due **6/17/2020**. Release of Transcript Restriction set for **9/15/2020**. (mah) (Entered: 06/10/2020) |
| 06/10/2020 | 45 | TRANSCRIPT Acknowledgment - Part II re 40 Notice of Appeal, Court Reporter:Megan A. Hague Transcript due by **6/10/2020**. (mah) (Entered: 06/10/2020) |
| 06/10/2020 | 46 | NOTICE of Filing Transcript (Part III) by Court Reporter in District Court - re: 40 Notice of Appeal, 45 Transcript Acknowledgment - Part II, 43 Transcript |

| | | Request Appeal Part I, Court Reporter: Megan A. Hague Certificate of Readiness (FRAP 11) due by **6/10/2020**. (mah) (Entered: 06/10/2020) |
|---|---|---|
| 06/11/2020 | 47 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: 40 Notice of Appeal. The entire record on appeal is available electronically. USCA # 20-12107-CC. (blb) Modified To include USCA # on 6/26/2020 (blb). (Entered: 06/11/2020) |
| 06/16/2020 | 48 | USCA PROCEDURAL LETTER re: 40 NOTICE OF APPEAL by INDEPENDENT PARTY OF FLORIDA, PARTY FOR SOCIALISM AND LIBERATION. USCA Appeal # 20-12107-CC (blb) (Entered: 06/26/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/06/2020 15:49:26 | | | |
| **PACER Login:** | ashleydavis | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:20-cv-00110-MW-MAF |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

Tab 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |  |
|---|---|---|
| INDEPENDENT PARTY OF FLORIDA and PARTY FOR SOCIALISM AND LIBERATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. <u>4:20-cv-00110-MW-CAS</u> |
| LAUREL M. LEE, Florida Secretary of State, in her official capacity, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MOTION FOR PRELIMINARY INJUNCTION

COMES NOW Plaintiffs The Independent Party of Florida ("Independent Party") and The Party for Socialism and Liberation ("Party for Socialism"), by and through their attorney of record, Daniel J. Treuden, to respectfully move this Court for a preliminary injunction barring the application of Fla. Stat. § 103.021(4) to keep their respective Presidential and Vice Presidential candidates off the November 2020 general election ballot. This motion is filed pursuant to N.D. Fla. Loc. R. 5.1 and 7.1.

## Conference Certificate

Pursuant to N.D. Fla. Loc. R. 7.1(C), the undersigned counsel

sought the position of counsel for the Defendant Laurel M. Lee ("Lee"),

but did not hear back before filing this motion.

## Standard of Review

Preliminary injunction:

> is appropriate if – but only if – the movant shows "(1)
> substantial likelihood of success on the merits; (2)
> irreparable injury will be suffered unless the injunction
> issues; (3) the threatened injury to the movant outweighs
> whatever damages the proposed injunction may cause the
> opposing party; and (4) if issued, the injunction would not be
> adverse to the public interest."

*Callahan v. United States Dept. of Health and Human Services*, 939

F.3d 1251, 1257 (11th Cir. 2019) (quoting *McDonald's Corp. v.*

*Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)).

In turn, regarding the merits of this constitutional challenge to

Florida's ballot access law, the court primarily follows the standard set

out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983):

> [A] reviewing court must first "consider the character and
> magnitude of the asserted injury to the rights protected by
> the First and Fourteenth Amendment[s]." [*Anderson*, 460
> U.S. at 789.] Then the court must "identify and evaluate the
> precise interests put forward by the State as justifications
> for the burden imposed by its rule." *Id*. Finally, the court

2

must "determine the legitimacy and strength of each of those interests," while also considering "the extent to which those interests make it necessary to burden the Plaintiff's rights." *Id*.

Further, if the state election scheme imposes "severe burdens" on the plaintiffs' constitutional rights, it may survive only if it is "narrowly tailored and advance[s] a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 . . . (1997). But when a state's election law imposes only "reasonable, nondiscriminatory restrictions" upon a plaintiff's First and Fourteenth Amendment rights, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id*. (quotations omitted). In short, the level of the scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights – "Lesser burdens trigger less exacting review." *Id*.

*Stein v. Alabama Secretary of State*, 774 F.3d 689, 694 (11th Cir. 2014).

In turn, given that this case involves a ballot access question in a presidential election, Florida has a diminished interest in regulating this election: "[W]e recognized that 'the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.'" *Id*. at 691 (quoting *Anderson*, 460 U.S. at 795).

## Time Table for Motion – Need for Preliminary Injunction

The deadline for minor parties to certify their candidates for November's presidential election ballot to the Secretary of State is September 1, 2020. It is unlikely that judgment in this case will be entered before that date considering the life of a typical civil case. Therefore, the Plaintiff's file this motion for preliminary injunction to avoid a deprivation of their rights in the 2020 presidential election cycle. There is sufficient time for the parties to fully brief this motion and the court to consider it without having to expedite this matter.

## Relevant Facts

*History of Minor Political Party Ballot Access Statutes in Florida*

For approximately fifty years from approximately 1949 to 1999, Florida provided ballot access for presidential candidates for minor political parties based solely on ballot access petitions. (Decl. of Richard Winger, ¶¶ 4-9) ("Winger Decl."). In 1998, Florida amended its state constitution which held that all candidates should be treated equally. *Id.*, ¶ 9. The legislature passed SB 754 in 1999 wherein minor political parties could become a "qualified party" if it filed a list of officers, a copy of its bylaws, and agreed to report information about its finances. *Id.*

4

Once qualified, a minor political party could affiliate with a "national" political party that held a national presidential convention, it could then place its presidential nominee on the ballot. *Id*. The 2000 election was the first time since before 1949 that a minor political party could nominate its candidates without circulating nomination petitions.[1]

The sky did not fall and voters were not befuddled over the number of choices on the ballot. Minor political parties freely placed presidential candidates on the ballot for the following parties: Green, Reform, Libertarian, Natural Law, Workers World, Constitution, Socialist, and Socialist Workers. *Id*. With the two major political party candidates, voters had to navigate a list that included a mere ten partisan candidates.

In 2004, six minor political parties nominated presidential candidates to the ballot: Constitution, Green, Libertarian, Reform, Socialist, and Socialist Workers. *See*

https://uselectionatlas.org/RESULTS/state.php?year=2004&fips=12&f=

---

[1] For parties that were not considered "national" parties, or if they were not affiliated with a party that held a national convention, the path to the ballot was achieved by submitting nomination petition with signatures at least equal to 1% of registered voters in the state.

0&off=0&elect=0&minper=0 (last accessed April 6, 2020). In 2008,

eleven minor political parties nominated their candidates by

certification: America's Independent, Boston Tea, Constitution, Ecology,

Green, Libertarian, Objectivist, Prohibition, Socialism and Liberation,

Socialist, and Socialist Workers. *See*

https://uselectionatlas.org/RESULTS/state.php?year=2008&fips=12&f=

0&off=0&elect=0&minper=0 (last accessed April 6, 2020). The partisan

candidate list voters had to consider was eight and thirteen in 2004 and

2008 respectively.

In 2011, the legislature passed a new law which changed the

definition of a "national" party to one that is "registered with and

recognized as a qualified national committee of a political party by the

Federal Election Commission." (Winger Decl., ¶ 12.) This definition is

the current definition at issue in this case. Fla. Stat. § 103.021(4)(a).

This change severely limited the number of minor political parties that

qualified to nominate their candidates by certification to the state's

presidential election ballot. The previous definition defined a national

party as a party that was previously on the ballot in two states, a

threshold that would typically be met by every party that also holds a

national convention. Fla Stat. § 103.021(4)(a) (2010 version) ("In this section, the term 'national party' means a political party established and admitted to the ballot in at least one state other than Florida.")

In 2011, counsel for the American Elect's party received a letter from the Florida Secretary of State advising the party that the new definition of "national party" would not be enforced and all minor parties acted accordingly. (Winger Decl., ¶ 13.) A copy of the letter addressed to the Americans Elect Party is submitted as Exhibit A. *Id.*

Although the Americans Elect Party ultimately decided not to run a candidate in 2012, this letter provided the basis for five minor political parties to nominate candidates by certification even though they were not FEC-recognized: American Independent, Justice, Objectivist, Peace & Freedom, and Socialism and Liberation. (Winger Decl., ¶ 13.) The FEC-recognized minor parties that certified candidates for the presidential ballot in Florida totaled four: Constitution, Green, Libertarian, and Socialist. With the two major political parties, that put the presidential ballot at eleven partisan candidates. *See* https://uselectionatlas.org/RESULTS/state.php?year=2012&fips=12&f=0&off=0&elect=0&minper=0 (last accessed on April 6, 2020).

7

In summary, the four presidential elections from 2000 through 2012 featured minor political party ballot access by mere certification, including most particularly, 2012 wherein *all* minor political parties were granted access to the ballot by certification of the party chairman. The total partisan candidates on the presidential ballot ranged from eight to thirteen candidates. Although the state says they need a 1% signature threshold to protect against a confusing ballot, the number of candidates based on actual experience are not so numerous to make a typical voter confused or make it difficult for them to locate their candidate of choice.

*The 2016 Election Cycle – Plaintiffs' Attempts to Nominate*

In 2016, both Plaintiffs in this case attempted to nominate candidates for office. (Decl. of Ernest Bach, ¶ 4 and Ex. B) ("Bach Decl."); (Decl. of Bryan Ellis, ¶ 4) ("Ellis Decl."). Both received similar letters to the one set forth as Exhibit B that stated the Secretary of State would not be including their candidates on the presidential ballot for the 2016 election. (Bach Decl., ¶ 5; Ellis Decl., ¶ 5.) In both cases, this advisement occurred too close to the election for either party to seek judicial relief from the Secretary of State's decision. (Bach Decl., ¶

6; Ellis Decl., ¶ 6.) This action violated the Plaintiffs' First and Fourteenth Amendment rights to association, speech, political activity, equal protection, and their respective members' voting rights. Furthermore, because the Secretary of State barred the Plaintiffs' presidential candidates from appearing on the 2016 presidential ballot, they fully expect the Secretary of State to bar them from certifying their candidates for the 2020 presidential ballot as other minor political parties are allowed to do, all in violation of the First and Fourteenth Amendments.

## Argument

The requirement that a minor political parties be affiliated with a national party recognized by the Federal Election Commission as a "national committee" before they can nominate their candidates by certification rather than by petition circulation is not narrowly tailored to further a legitimate state interest, even under the sliding scale standard approved by *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and violates the equal protection clause. Furthermore, the requirement that a minor political party submit a petition signed by one percent of the registered voters is an unconstitutional hindrance to the ballot under

the recent Georgia case that struck down a similar one-percent signature requirement statute: *Green Party of Georgia v. Kemp*, 171 F.Supp.3d 1340 (N.D. Ga. 2016) (aff'd on appeal in *Green Party of Georgia v. Kemp*, 674 Fed. Appx. 974, 2017 U.S. App. LEXIS 1769, 2017 WL 429257).[2]

These restrictions will severely injure the Plaintiffs and the Plaintiffs' members First and Fourteenth Amendment rights and this injury will be irreparable if their candidates are not on the 2020 general election ballot. The potential injury to the State of Florida if the State cannot enforce the status quo is also substantially outweighed by the injury to be suffered by the Plaintiffs and Plaintiffs' members if their candidate is barred from the ballot. Finally, the action would not violate the public interest if the preliminary injunction is granted.

## I.   Several Constitutional Rights are Violated by Florida's Substantial Burdens to Ballot Access.

The right to vote, the right to associate for political purposes, the right of voters to cast votes effectively, and the right to be a political

---

[2] The Eleventh Circuit issued the following opinion: "Judgment of the district court is affirmed based on the district court's well-reasoned opinion. *See Green Party of Ga. v. Kemp*, 171 F.Supp.3d 1340 (N.D. Ga. 2016).

candidate are fundamental constitutional rights protected by the First and Fourteenth Amendments. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 224 (1989); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214 (1986); and *Anderson*, 460 U.S. at 787.

First Amendment rights are implicated whenever a state action imposes a barrier to the free exercise of the voting franchise or any First Amendment Right. That barrier does not have to wholly prevent voters from exercising a First Amendment right to be found unconstitutional. And "'that right is burdened when the state makes it more difficult for these voters to cast ballots.'" *Molinari v. Bloomberg*, 564 F.3d 587, 604 (2nd Cir. 2009) (quoting *Price v. New York State Bd. of Elections*, 540 F.3d 101, 108 (2nd Cir. 2008)) . The First Amendment creates an open marketplace where ideas, most especially political ideas, may compete without government interference. It does not call on federal courts to manage the market by preventing too many buyers from settling on a single product." *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 208 (2008) (internal citations omitted). "[T]he First Amendment 'has its fullest and most urgent application' to speech

uttered during a campaign for political office." *Eu*, 489 U.S. at 223

(quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 886, 913 (1971)). Thus,

any limits on speech in the context of a political campaign is subject to

strict scrutiny. *Citizens United v. Federal Election Commission*, 558

U.S. 310, 340 (2010).

In ballot access cases, the First Amendment right of free association

is found in three associational relationships: (1) the right of voters to

associate through the organization of a political party; (2) the rights of

an organized political party to control the determination of those

candidates with which it associates; and (3) the rights of an organized

political party to control its nominations by controlling who may

participate in such nominations. *Democratic Party of the United States*

*v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 121-122 (1981).

The implications of the Equal Protection Clause on the

constitutionality of ballot access statutes generally focuses on (a) the

disparate treatment of major and minor parties, and (b) the disparate

treatment of the candidates of parties and independent candidates. *See*

*Anderson*, 460 U.S. at 793-94:

> A burden that falls unequally on new or small political
> parties or on independent candidates impinges, by its very

> nature, on associational choices protected by the First
> Amendment. It discriminates against those candidates and –
> of particular importance – against those voters whose
> political preference lie outside the existing political parties. .
> . . By limiting the opportunities of independent-minded
> voters to associate in the electoral arena to enhance their
> political effectiveness as a group, such restrictions threaten
> to reduce diversity and competition in the marketplace of
> ideas.

*Anderson*, 460 U.S. at 793-94 (internal citations omitted).

Here, in this Florida construct, there are two statutes that limit access to the ballot. First, the Plaintiffs are barred from the ballot if they are not associated with a party that is nationally recognized by the Federal Election Commission ("FEC") as a national committee even though there is no indication that FEC recognition has any logical correlation to voter support in Florida. Second, the requirement that a minor political party submit a ballot access petition signed by one-percent of registered voters is unconstitutionally burdensome for the same reasons set forth by *Green Party of Georgia*, 171 F.Supp.3d 1340 (aff'd on appeal in *Green Party of Georgia*, 674 Fed. Appx. 974).

As further explained below, these burdens are either unconstitutionally burdensome in their own right, or are applied in violation of the equal protection clause. And the state's likely

justification that ballots must be stringently regulated to avoid voter

confusion on the ballot proves a baseless reason for the regulation when

from 2000 through 2008, the three presidential election ballots had no

practical limit on ballot access other than organizing as a minor

political party and associating with a national party, and the 2012

presidential election ballot allowed all minor political parties to

nominate candidates by certification. The largest election ballot had

fourteen partisan options between 2000 and 2012, and 2012 proved that

the great state interest we need to protect against – a confusing and

unwieldy ballot – was nothing more than a non-existent bogeyman. A

list of eleven names is not confusing. Based on this actual experience,

and the relative weakness of the state's interest to protect against an

unwieldy ballot, the state should have to meet strict scrutiny in order to

justify any regulation requiring anything in excess of a party

chairman's certification.

## II. Judicial Review of Election Laws Requires Consideration of the Statutes in the Aggregate, and a Weighing of the Burdens Against the State Justifications, and Recognizing that Fundamental Rights Require Strict Scrutiny.

Political parties exist to advocate positions and philosophies and

serve as a vehicle where like-minded people can assemble. "Under our

political system, a basic function of a political party is to select candidates for public office to be offered to voters at elections." *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973).

> The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot.

*Williams v. Rhodes*, 393 U.S. 23, 31 (1968).

Thus, "'only a compelling state interest in the regulation of the subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms.'" *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).

Ballot access limiting statutes must be considered in the aggregate: "The concept of 'totality' is applicable . . . in the sense that a number of racially valid provisions of elections laws may operate in tandem to produce impermissible barriers to constitutional rights." *Storer v. Brown*, 415 U.S. 724, 737 (1974). "A court would want to examine the *cumulative* burdens imposed by the *overall* scheme of electoral regulations upon the rights of voters and parties to associate through primary elections." *Clingman v. Beaver*, 544 U.S. 581, 607 (2005)

(O'Connor, *concurring*) (recognizing that the appellant failed to properly raise the issue) (emphasis in original).

A district court evaluates constitutional challenges to state election laws as the Supreme Court set out in *Anderson*, 460 U.S. 780:

> [A district court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson*, 460 U.S. at 789.

"[A]s a general matter, 'before that right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny.'" *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (internal citations omitted). This scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 312 (internal quotations omitted). "Ordinarily, 'the strict scrutiny test is applicable under the Equal Protection Clause to classifications affecting the exercise of

16

fundamental rights.'" *Fulani v. Krivanek*, 973 F.2d 1539, 1542 (11th

Cir. 1992) (quoting *American Booksellers v. Webb*, 919 F.2d 1493, 1499

(11th Cir. 1990)).

In testing the legitimacy of a State's asserted interest, a court is not

required to accept at face value any justification the state may give for

its practices. Rather, the court must determine the offered justification

is real, and not merely a pretextual justification for its practices.

*Reform Party of Allegheny County v. Allegheny Count Dep't of Elections*,

174 F.3d 305, 315 (3rd Cir. 1999).

Even an otherwise legitimate state concern cannot be accepted

without evidence that the problem the state is asserting is real.

> The State has made no clear argument regarding the precise
> interests it feels are protected by the regulations at issue in
> the case, relying instead on generalized and hypothetical
> interests identified in other cases. Reliance on suppositions
> and speculative interests is not sufficient to justify a severe
> burden on First Amendment Rights.

*Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 593 (6th Cir.

2006).

Therefore, it is insufficient for the state to merely assert a defense; it

must rather present evidence of a real problem that its ballot access

limiting statutes seek to address. In addition to actually having a

legitimate reason for its practice, the state must also show that the statute actually addresses the problem. *Reform Party*, 174 F.3d at 315.

There are also limits on the State's interests when elections to federal office are involved: "The Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *United States Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833 (1995).

Here, actual experience from 2000 through 2012 shows that almost unfettered access to the ballot by a minor party chairman's certification will not result in a confusing or unwieldly ballot. Furthermore, as outlined below, the criteria for access to the ballot, namely that the FEC recognized a national party as a national committee, has no logical correlation to the level of party support in the Florida electorate, and consequently, the statute fails to actually address the problem the state claims exists.

## III. The Florida Statutes Are Unconstitutionally Severe Burdens on First and Fourteenth Amendment Rights of Free Speech in the Arena of Political Discourse, Association by the Parties and their Members, and the Rights of the Parties' Members and Others to Vote for the Candidates of their Choice.

Fla. Stat. § 103.021(4) is unconstitutional because the FEC's

determination that a party constitutes a national committee fails to

establish that a minor political party has any modicum of support under

Florida law, and the alternative one-percent signature requirement is

unconstitutional for the same reason articulated in *Green Party of

Georgia v. Kemp*, 171 F.Supp.3d 1340 (N.D. Ga. 2016), and the fact that

other minor political parties, some of whom may have a lesser modicum

of support in Florida than the Plaintiffs are exempted because they had,

at some point in their history, a sufficiently large enough party around

the country to be considered a "national committee" by the FEC.

### A. Florida's Reliance on the FEC's Determination that a Party Constitutes a National Committee Does Not Further a Legitimate State Interest and is Unconstitutional.

First, as to the requirement that a minor political party be

associated with an organization recognized by the FEC as national

committee implicates rights to free speech, association, and ballot

access, the statute makes no logical sense when you consider the types

19

of organizations that have been accepted and rejected for national

committee recognition by the FEC, and you compare them to

organizations that have various levels of political support in the

Florida. The burdens are severe because failing to convince the FEC

that it deserves national committee status potentially bars the minor

party from the ballot and in turn, completely expels the party and its

members from that election cycle's political discourse.

The equal protection clause is implicated because minor political

parties that have very little Florida voter support might be recognized

by the FEC, and in other instances, the FEC might reject a party that

has significant Florida support imposing on that party a significant

burden of conducting a ballot access signature campaign. Richard

Winger ("Winger") is an expert in ballot access laws and both

independent candidates and minor political parties' participation in

elections. (Winger Decl., ¶ 3.) Winger's curriculum vitae sets forth his

extensive experience and expertise. (Winger Decl., ¶ 3, C.V. included

with declaration.)

As fully set forth in Winger's declaration at paragraphs 15-41, there

is no logical correlation of the FEC's decisions to grant or reject a

political party's application for national committee status. To date, only six parties besides the two big ones – Democrats and Republicans – have been granted national committee status, and those are: (1) Libertarian Party in 1975; (2) Socialist Party[3] in 1980; (3) Natural Law Party in 1992; (4) U.S. Taxpayers Party in 1995 (which subsequently changed its name to Constitution Party in 1999); (5) Reform Party in 1998; and (6) Green Party in 2001. *Id*., ¶ 15.

In turn, nine parties have applied for national committee recognition and were denied: (1) Liberal Party of New York in 1976; (2) Pyramid Freedom Party in 1978; (3) Citizens Party in 1980; (4) National Unity Party in 1980; (5) Populist Party in 1988; (6) U.S. Taxpayers Party in 1992;[4] (7) Green Party in 1996;[5] (8) 1787 Party in 2013; and (9) United Party in 2016. *Id*. ¶ 16.

As such, there are only six minor parties that could possibly qualify for ballot access in Florida by virtue of their FEC national committee

---

[3] This Socialist Party is not associated with the Plaintiff in this case: The Party for Socialism and Liberation.
[4] The U.S. Taxpayers Party was subsequently granted national committee status two years later in 1994. (Winger Decl., ¶ 15.)
[5] The Green Party was subsequently granted national committee status five years later in 2001. (Winger Decl., ¶ 15.)

recognition. But only four of those parties are even organized as minor

political parties in Florida. *See*

https://dos.myflorida.com/elections/candidates-committees/political-

parties/ (last accessed on April 6, 2020). To become a minor political

party, you must merely follow the steps set forth in Fla. Stat. §

103.095(1). Analyzing Fla. § 103.095(1)-(3), a minor political party can

form with as few as three Florida residents and hence, if the Socialist

Party or National Law Party found three sympathetic Florida residents

to organize as an affiliated minor political party, they could obtain

immediate access to the 2020 Presidential ballot by mere certification

without establishing any other modicum of Florida electoral support.

Both Plaintiffs are well established in Florida, having been active in

Florida politics for several election cycles with many more than three

members. (Bach Decl., ¶ 7; Ellis Decl., ¶ 7.) Other than the most recent

presidential election in 2016, when the Secretary of State barred them

from placing their candidates on the ballot, these parties have both

place candidates on the ballot in 2008 and 2012.

There are also good reasons not to seek national committee

recognition because national committee recognition brings with it added

responsibilities to keep and file detailed federal campaign reports. (Winger Decl.,¶ 18.) A party may not believe that taking on that added administrative obligation is in their best interest, but that does not mean they can't have an impact in the election. Six parties have never asked for national committee status and yet polled over 50,000 votes nationwide. *Id.*

The FEC is also not considering particular states' interests when deciding to grant or deny national committee recognition. For example, the FEC tends to deny applications unless the party first places candidates on the ballot in several states and is organized across the nation. *Id.* ¶¶ 20-21. This requirement harms the Independent Party in particular because, true to its name, it desires to be Independent from any national organization. (Bach Decl., ¶ 8.) Rather, the Independent Party remains free to associate with any candidate they choose in each election cycle. *Id.*

This is not an uncommon or ineffective approach to exercising their rights to participate in a political election. Howie Hawkins was nominated to be the Socialist Party USA candidate for President, but is also seeking the nomination of the Green Party.

https://howiehawkins.us/howie-hawkins-wins-socialist-party-usa-nomination-green-candidate-seeks-to-build-left-unity-with-multiple-nominations/ (last accessed on March 25, 2020). Howie Hawkins'

website also indicates that he is seeking the nomination of several

"state-level independent progressive parties." *Id*. These include the

Peace and Freedom Party of California, the Progressive Party of

Oregon, the Citizens and Labor parties of South Carolina, and the

Liberty Union and Progressive parties of Vermont. *Id*. As the Supreme

Court has said:

> This First Amendment freedom to gather in association for
> the purpose of advancing shared beliefs is protected by the
> Fourteenth Amendment from infringement by any State. . . .
> And the freedom to associate for the common advancement
> of political beliefs, . . . necessarily presupposes the freedom
> to identify the people who constitute the association, and to
> limit the association to those people only.

*Democratic Party*, 450 U.S. at 121-22 (internal quotations and citations

omitted) (upholding the right of the Democratic National Committee to

bar Wisconsin delegates from participation in the national convention if

the Wisconsin open primary election violates the National Committee's

convention rules). Here, the Independent Party and its members like to

retain the control of who they nominate as a candidate for president in

the state party, and are not necessarily interested in submitting that control to a national convention. (Bach Decl., ¶ 8.)

The Independent Party's approach to these elections is a legitimate exercise of its constitutional right of association, and imposing ballot access requirements that would require them to abandon that approach is severely burdensome. Indeed, Winger has charted the number of states that were organized in a single state and also nominated a candidate for office. (Winger Decl., ¶ 43, Ex. D.) Several names on the chart pop off the page as well-known household names and very influential in elections over the last 25 years or so, including Donald Trump (who actually won the Presidency appearing as the nominee for the American Independent Party of California), Ralph Nader, Ross Perot and others. *Id*.

Finally, the FEC does not consider the modicum of support nationwide or in any states to determine national committee eligibility making this requirement an extremely weak proxy to show a modicum of support in Florida. The Libertarian Party polled only 3,673 votes in the entire nation in 1972, but was granted national committee status in 1975. (Wegner Decl., ¶ 23.) Then in 1980, the Socialist Party polled

6,898 votes nationwide and was granted national committee status in December 1980, but then the FEC rejected the Citizens Party application despite polling 234,294 nationwide in 1980. *Id.*, ¶ 24.

In 1988, the New Alliance Party polled 217,219 in the nationwide presidential election, but was denied national committee status, but the Socialist Party, which continued to be recognized only polled 3,882 nationwide votes. *Id.*, ¶¶ 25-26. And the examples continue in Winger's declaration at ¶¶ 27-41, all of which are important for the Court to review. What these examples make clear is that there is absolutely no correlation to Florida electorate support established by FEC national committee recognition.

If a modicum of voter support is not a factor in the FEC's national committee status determinations, the question has to be asked: what is the logic behind Florida using a 1% voter signature requirement *as an alternative* ballot access avenue if a minor political party is not an FEC recognized national committee? The answer is obvious, there is no logical basis. The entire construct makes no sense and cannot be explained, and it is the particular state's statutory schema that must be

analyzed in context to determine whether it passes constitutional muster. *Jenness v. Fortson*, 403 U.S. 431, 438 (1971).

Florida's current statutory construct does not hold up to the Supreme Court's constitutional test set forth in *Anderson* and the Plaintiffs' equal protection and other First Amendment rights are violated by the unequal treatment and imposing burden placed upon them to gain ballot access.

## B.  The One Percent Signature Requirement is Unconstitutional Pursuant to Controlling Eleventh Circuit Law.

The requirement that any local party is required to obtain signatures from one percent of the registered voters in the state is unconstitutional under the *Anderson v. Celebrezze* for the reasons articulated in *Green Party of Georgia v. Kemp*, 171 F.Supp.3d 1340 (N.D. Ga. 2016). Both Plaintiffs are severely burdened by the one-percent requirement because they would both require the use of paid professional circulators to meet the deadline and the cost would unpredictable and prohibitive to both parties.

According to the Florida Department of State's website the last general election was in 2018 and there were a total of 13,396,622

registered voters in Florida. *See*

https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reportsxlsx/voter-registration-by-party-affiliation/ (last accessed on April 6, 2020). The one-percent signature requirement would require the Plaintiffs to obtain 133,966 valid signatures, a task that would require a massive financial and time commitment that other minor parties are not required to achieve, even some that poll at much lower levels than the Plaintiffs.

The costs prohibitions would operate as a bar to the ballot to these Plaintiff parties. There is no way they could come close to paying the $1-3 necessary to obtain the over 150,000 signatures necessary to get on the ballot and the $15,000-$20,000 necessary to pay to the county supervisors that have to review the signature petitions as required by Fla. Stat. § 97.097(4). (Bach Decl., ¶ 9; Ellis Decl., ¶ 8.)

In *Green Party of Georgia*, the Court faced a challenge to a one-percent signature requirement that applied to all minor political parties seeking to nominate a presidential candidate (unless the minor party also obtained at least one-percent of the vote in the previous election). In other words, a party could nominate a presidential candidate if the

party either met a performance standard or a petition standard. The Florida statutory schema is actually more complicated because several minor political parties avoid the signature requirement entirely, not because they performed in the last election, but rather because they are associated with a party that, at some point in that party's history, was recognized by the FEC as a national committee. Those parties don't have to show *any* substantial support in Florida by either obtaining a certain signature percentage of registered voters or performing to a certain level in the prior election cycle. And this of course weighs heavily in favor of the Plaintiffs' claims that their rights are severely burdened by a law that is not designed to meet a legitimate state concern.

Nonetheless, the *Green Party of Georgia* district court's analysis also applies here. The case applied the constitutional standard set forth in *Anderson* articulated above. The court rejected the state's argument that the one percent signature requirement was a modest requirement that supported a legitimate state interest of avoiding voter confusion. *Green Party of Georgia*, 171 F.Supp.3d at 1359 and 1365. The district court pointed to the fact that in this particular case, Georgia's 50,000+

signature requirement wasn't narrowly tailored to further a state

interest. *Id*. at 1365. "Georgia offer[ed] no evidence of voter confusion.

And Justice Harlan, concurring in *Williams v. Rhodes*, opined that 'the

presence of eight candidacies cannot be said, in light of experience, to

carry a significant danger of voter confusion.'" *Id*. at 1365-66 (quoting

*Williams v. Rhodes*, 393 U.S. 23, 47 (1968). That is similar to what

we've had here. For four presidential election cycles from 2000 through

2012, Florida allowed all minor political parties to nominate their

candidates by certification, and the Plaintiffs know of no reports of

widespread voter confusion even though at least one ballot had fourteen

partisan candidates listed. And although Justice Harlan held that eight

candidacies cannot be said to be confusing, the Plaintiffs assert that a

list of fourteen is still in that same non-confusing arena.

Here, we have Florida statute that allows minor political parties

two avenues to nominate presidential candidates: one that allows a

party to certify a candidate without establishing any modicum of

support in Florida, and one that requires an enormous commitment in

terms of both human time and financial resources, and one that most

minor parties probably could not meet if required to do so. Under these

circumstances, the Supreme Court's case of *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) seems most apt.

In *Socialist Workers Party*, Illinois had a signature requirement for ballot access in a statewide election that required a fixed 25,000 signatures. *Id.* at 175. In a local election, the signature requirement was 5% of the number of persons who voted in the last election. *Id.* at 176. As the City of Chicago population grew, it ended up that political parties that wanted access to the Chicago ballot had to obtain 63,373 valid signatures. *Id.* at 177. Therefore, a new political party could gain ballot access in a race for governor by submitting 25,000 signatures from residents in the entire state, but to get on the ballot in Chicago, the party had to submit 63,373 signatures from a smaller geographic area.

The Supreme Court applied the equal protection clause and struck down the 5% signature requirement because when you considered the statutory schema together, they could not be reconciled. Here in Florida, we have the same situation. The one-percent signature requirement cannot be reconciled with statute that allows another

party access for what really amounts to significant support *outside* of Florida. If a party is popular outside of Florida, then they become effectively exempt from showing any modicum of support in Florida before presenting their candidates to the voters on a general election ballot. For this reason, the one-percent signature requirement is due to be deemed unconstitutional.

Finally, no minor or new political party or independent candidate has ever achieved ballot access with a signature requirement as high as the one effective in Florida under Fla. Stat. § 103.021(4)(b) except once in California. Winger prepared a chart for his newsletter *Ballot Access News* in 2009 outlining the highest petition requirement met by a candidate. The chart is attached as Exhibit C. (Winger Decl., ¶ 42, Ex. C.) This chart makes clear that it's not necessarily just a high *percentage* of the electorate that can provide an effective unconstitutional bar to the ballot, but also the size of the signature campaign itself is an effective bar. This Court should grant this motion for preliminary injunction and allow all minor political parties to nominate their candidates by certification to the Secretary of State by September 1, 2020.

**IV. Florida Should be Preliminarily Enjoined from Enforcing Fla. Stat. § 103.021(4) and Allow All Minor Political Parties to Nominate Their Presidential Candidates by Certification to Avoid an Irreparable Injury Because the Plaintiffs are Likely to Prevail on the Merits, the Damages to the State are Slight if they Exist at All, and the Injunction Would Not be Adverse to Public Interest.**

As articulated above, the standards to obtain a preliminary injunction require a showing by the movant that they have a substantial likelihood of success on the merits, that they will suffer an irreparable injury without the injunction, that the threatened injury outweighs the damages the injunction might cause to the opposing party, and the injunction would not be adverse to the public interest. *Callahan*, 939 F.3d at 1257.

Here, Florida's reliance on the FEC national committee determination has no logical correlation to showing any modicum of electoral support in Florida and as such, requiring the Plaintiffs to prove that support by conducting an extremely expensive and time-consuming signature campaign violates the Plaintiffs' rights under the Equal Protection Clause. And the one-percent signature requirement is also unconstitutional under the analysis provide by *Green Party of Georgia* and the Supreme Court's *Socialist Workers Party* cases.

Because the Florida statutes are not narrowly tailored to further a legitimate state interest, the Independent Party and Party for Socialism are substantially likely to prevail on the merits.

The Independent Party and Party for Socialism are also set to suffer an irreparable injury if they are barred from nominating a candidate to the 2020 ballot. The 2020 ballot will occur in November and once that date passes, there is no remedy at law, including monetary damages, that could cure the harm. These two parties already suffered a similar fate in 2016 when they were advised at the very last minute that their nominations were rejected.

The injury to the plaintiffs is also great while the potential harm the state might suffer if the injunction is granted is near nil. There is no significant additional cost by adding two names to the presidential ballot because the ballots will have to be printed or organized after all of the other minor political parties nominate their candidates by certification by September 1, 2020.

And finally, the injunction would serve no harm to the public. Rather, the public might be served if they were provided two additional options at the ballot box, and the public will also have the opportunity

to hear from the nominated candidates during the campaign talk about the issues that are important to them.

For the foregoing reasons, the Plaintiffs respectfully request the Court grant the motion for preliminary injunction barring enforcement of the challenged provisions of Fla. Stat. § 103.021(4) and allow the Plaintiffs to nominate their Presidential and Vice Presidential candidates to the Florida November general election ballot by certification as other minor political parties in Florida are allowed to do.

Dated this 6th day of April, 2020.

Respectfully submitted,

**THE BERNHOFT LAW FIRM, S.C.**
Attorneys for Plaintiffs


By: /s/ Daniel J. Treuden
Daniel J. Treuden
Admitted *pro hac vice*

1402 E. Cesar Chavez Street
Austin, Texas 78702
telephone: (512) 582-2100
facsimile:  (512) 373-3159
djtreuden@bernhoftlaw.com

## **CERTIFICATE OF SERVICE**

The foregoing document was served on the Defendant by the ECF

system at the time of filing:

ashley.davis@dos.myflorida.com
Deputy General Counsel Ashley E. Davis

Attorney for:
Laurel M. Lee, Florida Secretary of State
R.A. Gray Building
500 S. Bronough Street
Tallahassee, Florida 32399

Signed this 6th of April, 2020.

 /s/ Daniel J. Treuden
Daniel J. Treuden

Tab 34

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

THE INDEPENDENT PARTY OF
FLORIDA and THE PARTY FOR
SOCIALISM AND LIBERATION,
     *Plaintiffs*,                   CASE NO: 4:20-cv-00110-MW-CAS

v.

LAUREL M. LEE, Florida
Secretary of State, in her official capacity,
     *Defendant*.
_____/

## SECRETARY'S RESPONSE IN OPPOSITION TO
## MOTION FOR PRELIMINARY INJUNCTION

Defendant, Florida Secretary of State Laurel M. Lee, responds in opposition to Plaintiffs' Motion for Preliminary Injunction (DE 9).  Minor political parties can access Florida's General Election Ballot and, consequently have their presidential candidate's names printed thereon by *either*: 1) affiliation with a national party; or, 2) by petitions signed by one percent (1%) of the state's electors (132,781).  *See* Fla. Stat. § 103.021(4)(a) (affiliation) and (b) (petition).  Plaintiffs' Complaint states only as applied challenges to the alternative access methods.  (DE 1 at 12) (Prayer for Relief).  Plaintiffs' Motion however, states that the alternative methods "are either unconstitutionally burdensome in their own right, or are applied in violation of the equal protection clause."  (DE 9 at 13).  Whatever the attack, the alternative petition and affiliation access methods are valid and should be upheld.

But for now, Plaintiffs have not clearly established their burden for preliminary relief and their Motion should therefore be denied.

## I.    STANDARD

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981).  "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Keister v. Bell,* 879 F.3d 1282, 1287 (11th Cir. 2018) (collecting citations). The four requisites Plaintiffs "must clearly establish" are: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the [P]laintiff[s] outweighs the potential harm to the [D]efendant; and (4) that the injunction will not disserve the public interest." *Id.* (citations omitted). Notably, the rule governing preliminary injunctions "does not place upon the [non-moving party] the burden of coming forward and presenting its case against a preliminary injunction." *Alabama v. U.S. Army Corps of Eng'rs,* 424 F.3d 1117, 1136 (11th Cir. 2005) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70,* 415 U.S. 423, 442 (1974)).

## II.   ARGUMENT

Rather than preserve the status quo pending trial, Plaintiffs seek to *upend* the status quo and have their candidates preemptively placed on the 2020 General Election Ballot without having to first establish their case.  This would be an extraordinary use of an already extraordinary preliminary injunction.  Moreover, the chaos and confusion it would cause outweighs the injury to Plaintiffs and disserves the public interest.  These last two factors of the injunction analysis do not typically decide the issue.  Here they may.  Nevertheless, Plaintiffs' claims should fail to succeed and this, either alone, or coupled with the weight of potential harm to election officials and the public and disservice to the public interest, should result in Plaintiffs' Motion being denied.

### A.   **Plaintiffs Are Not Substantially Likely to Succeed on the Merits; They Should Fail**

Plaintiffs are not substantially likely to succeed on the merits.  To the contrary, they should fail. *See e.g. U.S. Taxpayers of Fla. v. Smith*, 871 F. Supp. 426 (N.D. Fla. 1993) (upholding Florida's same 1% petition threshold), *aff'd*, 51 F. 3d 241 (11th Cir. 1995); *Beller v. Kirk*, 328 F. Supp. 485 (S.D. Fla. 1970) (upholding Florida's previous and *higher* 3% petition threshold for minor party statewide candidates), *aff'd mem.*, 403 U.S. 925 (1971).  *Libertarian Party of Florida v. State of Fla.*, 710 F. 2d 790 (11th Cir. 1983) (upholding *again* Florida's previous 3% petition threshold for minor party statewide candidates); *De La*

*Fuente v. Padilla*, 930 F. 3d 1101 (9th Cir. 2019) (upholding California's

requirement to collect petitions of 1% of electors in the state within a 110-day

period).

As a preliminary matter, Plaintiffs lack standing to challenge either

alternative method of ballot access.[1]  As to the petition method, Plaintiffs have not

alleged any injury caused by the state.  (DE 15 at 11) (conceding Plaintiffs have

decided not to even try collecting petitions); *see infra* at B (evaluating the lack of

state-inflicted injury).  As to the affiliation method, Plaintiff Independent Party's

most recent governing documents require use of the petition method *only* for

access to the presidential ballot.  Req. for Jud. Ntc. ¶ 1 (IND Rules) ("Article 8:

Presidential Electors" "a candidate … shall initiate the need for a slate of

Presidential Electors" as required by "103.021(4)(b)").  Moreover, it has to be

initiated by a candidate, but there is no such candidate identified in this action. *See*

*id.*  According to Plaintiff Party for Socialism and Liberation's most recent

governing documents, it *is* "affiliated with the national party, Party for Socialism

and Liberation."  Req. for Jud. Ntc. ¶ 4 (PSL Rules) (Article I of the Charter).

Minor parties are required to file these governing documents upon registration and

---

[1] Plaintiffs do not lack standing in light of
 *Jacobson v. Florida Secretary of State*, No. 19-14552, 2020 WL 2049076 (11th
Cir. Apr. 29, 2020).  DE 29.  They lack standing based on their own positions, not
the Secretary.

notify the Department of State of any changes within 5 days.  Fla. Stat. §

103.095(4).  Plaintiffs therefore lack standing.

Otherwise, the Court must engage in a three step process in evaluating ballot

access requirements.  *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  Each

step is addressed in turn.

### 1.  Any Alleged Burden on Plaintiffs' Rights is Not Severe

This first step is an important one.  Ultimately, the "rigorousness" of the

Court's inquiry "depends upon the extent to which a challenged regulation burdens

First and Fourteenth Amendment rights," *Burdick*, 504 U.S. at 435, *quoting*

*Anderson*, 460 U.S. 780.  With that said, the first step is for the Court to "consider

the character and magnitude of the asserted injury to the rights protected by the

First and Fourteenth Amendments that the plaintiff seeks to vindicate."  *Anderson*,

460 U.S. at 789.  Here, Plaintiffs assert the right to be a minor party on the ballot.[2]

That right is *not* fundamental.  *E.g.*, *U.S. Taxpayers of Fla.*, 871 F. Supp. at 429-

---

[2] Plaintiffs' other asserted rights either cannot be asserted by them, or are not
implicated by the challenged laws.  *See* (DE 9 at 10, 12).  Plaintiffs do not include
voters or candidates.  Nor do the party access alternatives directly implicate the
"right to vote" or vote "effectively," or the "right to be a political candidate."  *Id.*
As Plaintiffs point out, candidates frequently court the favor of several different
parties, even for the same election.  *See* (DE 9 at 25) (*e.g.* Trump, Nader, Perot);
(DE 9-1, ¶¶ 43-48).  The challenged alternatives do not infringe at all on a minor
party's internal operations either.  The right "to control the determination of those
candidates with which [a Plaintiff] associates," and to "control its nominations by
controlling who may participate in such nominations," are therefore not implicated
either.

30; *Anderson*, 460 U.S. at 787-88; *c.f.*, *Green Party of Georgia v. Kemp*, 171 F.

Supp. 3d 1340 (N.D. Ga. 2016) (finding voters' fundamental rights affected in

ballot access case where voters had *no* option of minor party on the ballot when

such parties were clamoring for a spot), *aff'd mem.* 674 Fed. Appx. 974, 2017 WL

429257 (11th Cir. 2017).

Now to the burden alleged by Plaintiffs.  It is "incumbent upon Plaintiff[s] to

point to specific facts" supporting the contention that the challenged laws are

"unconstitutionally burdensome."  *De La Fuente v. California*, 278 F. Supp. 3d

1146, 1151 (C.D. Cal. 2017), *aff'd* 930 F. 3d 1101 (9th Cir. 2019).  "Nothing in

*Anderson* suggests" the Court can make the "hard judgments" necessary to its

evaluation "without evidence of the severity of Plaintiffs' burdens."  *Stein v. Ala.*

*Sec'y of State*, 774 F. 3d 689, 696 (11th Cir. 2014).  It is "not the State's burden to

marshal evidence negating every … bare contention."  *De La Fuente*, 278 F. Supp.

3d 1151.  It is not readily apparent from Plaintiffs' Motion what their specific

burdens are, although they state they are "severe."

As to the national affiliation alternative, Plaintiffs simply rest on their lack

of *desire* to affiliate with a national party.  Plaintiff Independent Party simply

"desires to be [i]ndependent from any national organization."  (DE 9 at 23) (citing

Bach Decl.).  And Plaintiff Party for Socialism and Liberation simply disclaims

affiliation with the national Socialist Party.  (DE 1, ¶ 22).  No reason is given for their lack of affiliation.

Plaintiffs make no argument and put forth no facts that indicate affiliation with a national party, or becoming a national party in their own right, is at all difficult or that they have even tried.  To the contrary, their evidence indicates that every other current Florida minor party but one has done so.  (DE 1, ¶¶ 20-23).  Four out of the seven minor parties in Florida are affiliated with national parties and may therefore certify their presidential candidates for ballot placement on the 2020 General Election Ballot.  *Id.*  Minor parties in Florida have done so in the past with success as well.  *See* (DE 9-1).  Since the current alternatives have been in place, ten (10) minor parties accessed Florida's ballot by certifying affiliation in 2012 and four (4) accessed it in 2016.  (DE 9 at 8) ("*all* minor political parties" in Florida were on the 2012 ballot); Req. for Jud. Ntc. ¶ 8 (Candidate Listing).  Interestingly, Plaintiff Party for Socialism and Liberation was one of those minor parties on the 2012 ballot.  (DE 9 at 22); Req. for Jud. Ntc. ¶ 8 (Candidate Listing).  A many and varied other minor parties have accessed the ballot by affiliation in every presidential election since 2000. *See* Req. for Jud. Ntc. ¶ 8 (Candidate Listing).[3]  In all of those years, the two major parties were also on the ballot, along

---

[3] From 2000 to 2016: Prohibition Party, Constitution Party, Libertarian Party, Florida Socialist Workers Party, BTP, America's Party of Florida, Party for Socialism and Liberation – Florida, Green Party, Socialist Party of Florida,

with some combination of no-party-affiliated (NPA) and write-in candidates. *Id.* (Candidate Listing). Voters have never been short on choice in Florida, even looking at minor party choices alone. The affiliation method does not impose severe burdens.

Nor is it discriminatory. Plaintiffs argue that the affiliation method discriminates *amongst* minor parties because national party affiliation is "not rationally related to the level of support that a party has in Florida" or "any interest in regulating access to the Presidential ballot." (DE 1 ¶¶ 34-35); (DE 9 at 33). Plaintiffs do not allege that minor parties are treated poorly compared to major parties or any other group. Plaintiffs instead allege the discrimination occurs within minor party status itself. But, *all* minor parties must show a significant modicum of support before Florida must place them on its ballot. *E.g. Jenness v. Fortson*, 403 U.S. 431, 442 (1970). Minor parties have two methods of doing so. Fla. Stat. § 103.021(4)(a)-(b). They may show support within the state by gathering petitions, or they may show support nationally, acknowledging that presidential elections are decided by all states, and not just Florida.

As to the alternative petition method, Plaintiffs simply do not *want* to engage even their own *members* (or other volunteers), to circulate petitions, instead

---

Ecology Party of Florida, Objectivist Party, Reform Party, The Natural Law Party, Workers World Party, Justice Party of Florida, Peace and Freedom Party.

alleging an estimated $100,000 burden to "hire and train sufficient laborers" to do it instead. (DE 1 ¶ 26); (DE 9 at 27). No reason is given why Plaintiffs' members or other volunteers cannot meet the petition threshold themselves, or why they cannot raise sufficient contributions to hire the professionals. Plaintiffs' membership numbers, the alleviating factors recognized in *Libertarian Party* and *U.S. Taxpayers of Florida*, and the *four* years they have to collect signatures belies any argument to the contrary. *See* (DE 8 at 6-10)[4]. So does the Eleventh Circuit's analysis in *Stein*. (DE 8 at 8-9). In *Stein*, the Eleventh Circuit *rejected* a minor party's argument that the cost of $100,000 to $200,000 to pay signature gatherers in time for placement on Alabama's presidential ballot, among other reasons, made the burden severe. *Stein v. Ala. Sec'y of State*, 774 F. 3d 689, 697 (11th Cir. 2014).

If a "reasonably diligent candidate can be expected to satisfy the signature requirements," then the burden is not severe, and the State's interests will generally be a sufficient justification. *Libertarian Party of Florida*, 710 F. 2d at 793 (quoting *Storer v. Brown*, 415 U.S. 724, 742 (1974)). Plaintiffs have failed to show the contrary; indeed, they have failed to even *try* the petition method.

To be fair, no other minor party in Florida seems to have tried, but that is most likely because all but one are affiliated with a national party and therefore do not have to collect petitions. Or, it could be that voters have enough choice and are

---

[4] The Secretary incorporates her Motion to Dismiss (DE 8) by reference.

therefore uninterested in signing a petition to place *another* choice on the ballot.
*See Del La Fuente v. Padilla*, 930 F. 3d 1101, 1105-06 (9th Cir. 2019) (noting
Winger, the expert in that case (and this case), "suggested that 'there's almost
nobody left to petition' because voters have their choice" among several other
major and minor party candidates). Plaintiffs acknowledge however, that a
presidential candidate has achieved placement via a 1% petition threshold. (DE 9-
1, ¶ 42); (DE 9-4) (Ross Perot, California 1992). It can and has been achieved.

But Plaintiffs are wrong when they (and their expert) state that "[e]xcept"
for that candidate in California, no one "has ever overcome a petition requirement
[as] high" as 1%. (DE 9-1, ¶ 42); (DE 9 at 32). In 1996, the same candidate
achieved placement on Florida's presidential ballot by either being affiliated with a
national party *and* meeting a 3% signature requirement, or meeting the same 1%
requirement here.[5] Req. for Jud. Ntc. ¶ 8 (Candidate Listing) (Ross Perot Reform
Party); Fla. Stat. § 103.021(3),(4) (1995). Another minor party that year seems to
have done the same. Req. for Jud. Ntc. ¶ 8 (Candidate Listing) (Harry Browne
Libertarian Party).

But they are not even the only candidates in Florida to have done so. Florida
has the same, alternative 1% petition threshold for statewide candidates to access

---

[5] We cannot tell from the records which method was actually used, but the point is
that each access method available at that time was as difficult *or more* difficult
than the current alternative methods.

the ballot as well.  Fla. Stat. § 99.095(2)(a).  In 2010, candidate Kendrick Meek successfully attained ballot placement for election to the Office of United States Senate by collecting the requisite petitions from 1% of Florida's voters.  Req. for Jud. Ntc. ¶ 9 (Candidate Listing U.S. Senate 2010).  The chart[6] prepared by Plaintiffs' expert seems to have altogether missed the second candidate who achieved access in 1996, and the statewide candidate who achieved access in 2010.  (DE 9-4) (noting by asterisk that the requirement in 1995 "has since been amended to require *fewer* signatures").

Petitioning generally is a regular occurrence in Florida.  For the 2020 General Election Ballot, four initiative petition sponsors have successfully attained position for their proposed constitutional amendments by, among other things, collecting signed petitions.  Req. for Jud. Ntc. ¶ 10 (2020 Initiatives).  The petition threshold is higher for initiative petitions than for candidates or minor parties.

---

[6] States' ballot access schemes vary greatly, even over time, considering their frequent litigation.  Some states put restrictions on when and from whom signatures can be gathered.  *E.g. Green Party of Georgia*, 171 F. Supp. 3d at 1347 (requiring circulator affidavit that signatures gathered "within the 180 day" window).  Florida, by comparison, does not.  *See Libertarian Party of Florida*, 710 F. 2d at 794-95 (giving examples of different restrictions on signature gathering and concluding Florida's lack of restrictions in this regard made its scheme very different).  The chart presented by Plaintiffs' expert is therefore attempting to compare apples to oranges.  The closest petition scheme to Florida's may just be California's 1% threshold.  But even there, California requires petitions to be collected solely within a 110-day window.  *De La Fuente*, 278 F. Supp. 3d at 1148-49 (explaining section 8403 of California's Election Code).  In Florida, parties and candidates have 4 years.  Rule 1S-2.045(1)(b) and (5)(9); Fla. Stat. § 99.095(2)(a).

Initiative petition sponsors must collect petitions "signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight percent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding [presidential] election." Fla. Const. art. XI, § 3; Fla. Stat. § 100.371.  That means that *each* of the four sponsors who attained ballot placement collected 766,200 signed petitions.  Moreover, each signature they collected only had a 2-year shelf life.  Fla. Stat. § 100.371(11).  Voters also regularly sign candidate petitions.  In the last qualifying period (for U.S. Representative, judicial, state attorney, and public defender candidates ending on April 24, 2020), *see* sections 99.061 and 105.031, Florida Statutes, 32 candidates qualified by the petition method.  (Matthews Decl. ¶ 10).  Throughout Florida, there are voters who are ready, willing, and able to sign petitions.

Nevertheless, Florida's petition method for minor party access is not severe as a matter of law.  The Supreme Court has noted that "gathering 325,000 signatures in 24 days would not appear to be an impossible burden" or an "impractical undertaking for one who desires to be a candidate for President." *Storer v. Brown*, 415 U.S. 724, 740 (1974) (remanding to determine whether the 24-day collection period or pool of available signatories is diminished by other requirements to render the threshold too great in fact); *De La Fuente*, 278 F. Supp.

3d 1146, 1155 (C.D. Cal. 2017) (finding 267,058[7] signatures in California's 105-day window is not a severe burden), *aff'd* 930 F. 3d 1101 (9th Cir. 2019).

A ballot access law imposes a severe burden only if it "*freeze*s the status quo by effectively barring all candidates other than those of the major parties" and does not "provide a realistic means of ballot access." *Libertarian Party of Florida v. State of Fla.*, 710 F.2d 790, 793 (11th Cir. 1983) (emphasis added). Indeed, the "primary concern is with the tendency of ballot access restrictions to limit the field of candidates from which voters might choose." *Anderson*, 460 U.S. at 787. In no way has Florida's alternative access methods limited voters' choice. To the contrary, they have allowed many and varied minor parties to access Florida's ballot in every presidential election. *See* Req. for Jud. Ntc. ¶ 8 (Candidate Listing); *supra* n.2. The methods are therefore not severe. Rather, they are "reasonable, nondiscriminatory restrictions" to be evaluated with lesser scrutiny. *Anderson*, 460 U.S. at 788.

2. Florida's Interests Are Important

Second, the Court "then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789. Florida's interests are the well-settled and important

---

[7] This number was 50% over the actual requirement that year, but was nevertheless entertained to show an even greater number would still be "within the realm of reason." *Id.*

interests "in requiring some preliminary showing of a significant modicum of support," which includes, at least, "avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness v. Fortson*, 403 U.S. 431, 442 (1970); *Storer*, 415 U.S. at 731 (reiterating "strong interest" in "maintaining the integrity of the political process by preventing interparty raiding"); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 352 (1997) (reiterating "valid state interest in ballot integrity and political stability"). "[B]ecause, it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." *Anderson*, 460 U.S. at 788 n.9.

After its decision in *Anderson*, the Supreme Court had the opportunity to again assess ballot access requirements in *Munro v. Socialist Workers Party*, 479 U.S. 189 (1986).  The Court took that opportunity to again make "clear" that "while there is no litmus-paper test for deciding a case like this," the Court had already "establish[ed] with unmistakable clarity [in several cases] that States have an undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Munro*, 479 U.S. at 193-94 (internal citations omitted).  Again, the Court "reaffirm[ed] that principle." *Id.* Then in *Burdick*, the Court *again* reaffirmed that "the State is within its rights to reserve the general election ballot for major struggles and not a forum for continuing intraparty feuds." *Burdick v. Takushi*, 504 U.S. 428, 439 (1992)

14

(internal quotations omitted).  The Court has affirmed again and again the same interests Florida relies on here.

Plaintiffs put forth a national interest that they purport "diminishe[s]" any interest Florida has because the outcome of a presidential election "will largely be determined by voters beyond the State's boundaries."  (DE 9 at 3).  That may not be true for a state like Florida.  Plaintiffs ignore that Florida has an outsized share of the outcome in the 2020 presidential election.  Florida is the third largest state by population and tied for third largest state by electoral college votes.  Nor would the "national interest" matter to Plaintiffs who are strictly one-state parties.  (DE 9, 23-25).  No reason is given why it is in the national interest for a candidate to be on each state's ballot under a *different* party, which is the reason Plaintiffs allege one-state parties are important.  *See* (DE 9 at 23-25); (DE 9-1, ¶¶ 43-48).  The "primary function of elections is to elect candidates" not give minor party voters "satisfaction knowing that he or she has helped to boost the candidate's total." *Libertarian Party v. District of Columbia*, 768 F. Supp. 2d 174, 186 (D.C. Cir. 2011).  The "national interest" is only "but one factor" in the analysis anyway. *Nader v. Connor*, 332 F. Supp. 2d 982, 988 (W.D. Tex. 2014).

Nevertheless, Florida accounts for those minor parties that may not have a significant modicum of support within its own borders, but enjoy support nationally.  It does so by the alternative affiliation method.  *Cf. Green Party of*

*Georgia v. Kemp*, 171 F. Supp. 3d 1340 (N.D. Ga. 2016) (finding that "in this case" the state's interest "is not sufficiently important to justify" the restrictions because the "interest is outweighed by a national interest" that *Georgia* did not account for), *aff'd mem.* 674 Fed. Appx. 974, 2017 WL 429257 (11th Cir. 2017). Regardless of whether a minor party can gather enough support within Florida with the petition method, it can still access Florida's ballot by certifying[8] that it is affiliated with a national party.  According to Plaintiffs, that means placing its candidates for president and congress on the ballot, "under the party label, in several states" and being "organized throughout the United States."  (DE 9-1, ¶ 19); (DE 9 at 23).  And, according to Plaintiffs, "six minor parties" could "qualify for ballot access in Florida by virtue of their FEC [Federal Election Commission] national committee recognition."  (DE 9 at 21-22). "[O]nly four of those parties" are already minor parties in Florida, leaving another *two* minor parties that could

---

[8] Plaintiffs assert that a 2011 letter from Defendant indicated that Defendant would not enforce the requirement that a minor party be affiliated with a national party. (DE 9 at 7). Plaintiffs' description is somewhat misleading in that it implies that Defendant indicated she would not follow the law. Rather, the letter accurately stated that the role of Defendant as a qualifying officer is not to investigate the truthfulness of a candidate or party's assertions as to its qualifications and, if paperwork is complete on its face, such qualification is to be made. (DE 9-3) *citing David ex rel. Taylor v. Crawford*, 116 So. 41, 42 (Fla. 1928). An interested party can challenge the qualification decision and the truth and accuracy of assertions made in the paperwork. *See generally Reform Party of Fla. v. Black*, 885 So. 2d 303, 304-05 (Fla. 2004). Defendant never, in the 2011 letter or otherwise, indicated that she would not follow the law or that the 2011 definition of "national party" was to be ignored or disregarded.

access Florida's ballot by affiliation if they so choose. *Id.* at 22. Indeed, the burden

to do so would be slight. With "as few as three Florida residents" those two parties

"could obtain immediate access to the 2020 Presidential ballot." *Id.* Not because

of Florida support, *per se*, but rather national support sufficient to participate in a

national election.

Florida does not need to make any particularized showing in support of its

interests related to requiring a showing of a significant modicum of support.

*Swanson v. Worley*, 490 F. 3d 894, 912 (11th Cir. 2007), *citing Munro v. Socialist*

*Workers Party*, 479 U.S. 189, 195-96 (1986); *Stein v. Ala. Sec'y of State*, 774 F. 3d

689, n.17 (11th Cir. 2014). The Court made clear in *Munro*, that "[w]e have never

required a State to make a particularized showing of the existence of voter

confusion, ballot overcrowding, or the presence of frivolous candidacies prior to

the imposition of reasonable restrictions on ballot access." 479 U.S. at 194-95

(rehashing its prior precedent in abundant clarity). Such a requirement would be

unwieldy, "invariably lead[ing] to endless court battles over the sufficiency of the

'evidence' marshaled by a State to prove the predicate." *Id.* at 195. Moreover, it

"would necessitate that a State's political system sustain some level of damage

before the legislature could take corrective action." *Id.* But, legislatures, the Court

thought, "should be permitted to respond to potential deficiencies in the electoral

process with foresight rather than reactively, provided that the response is

reasonable and does not significantly impinge on constitutionally protected rights."
*Id.* at 195-96.  Again, in *Timmons*, the Court reiterated that "[e]laborate, empirical
verification of weightiness is not required."  520 U.S. at 352.

Against this authority, Plaintiffs cite two cases to support their proposition
that Florida must put forth "evidence that the problem the state is asserting is real."
(DE 9 at 17).  In the first case, *Reform Party*, the court did not reject the state's
interests due to lack of evidence put forth in support.  *Reform Party of Allegheny
Cnty. v. Allegheny Cnty Dep. Of Elections*, 174 F. 3d 305, 315 (3d Cir. 1999).  To
the contrary, the state "ha[d] identified justifications, such as preventing ballot
manipulation and preserving political stability, that were recognized in *Timmons*
to be legitimate state interests."  *Id.*  Simply identifying well-recognized interests was
sufficient.  *Id.*  What the state did *not* do was engage in the *next*, third step in
*Anderson*.  *Id.*  Indeed, what the court found insufficient was that the state "ha[d]
not demonstrated how these interests are served by the unequal burden imposed
[t]here."  *Id.*  Florida addresses that final step below. The second case Plaintiffs
cite, *Blackwell*, merely cites back to the first case (*Reform Party*) and another case,
*Edenfield v. Fane*, 507 U.S. 761 (1993), that involved commercial speech and not
ballot access.  *Libertarian Party of Ohio v. Blackwell*, 462 F. 3d 579 (6th Cir.
2006).  The court in *Blackwell* did not at all address the authority holding the
contrary either.

Nevertheless, Florida does have evidence.  Prior to 2012, when less-restrictive requirements governed the minor parties, one individual formed 40 different parties in a year and a half.  Req. for Jud. Ntc. ¶ 11 (Larose Filings). Even under the current ballot access methods, there have been as many as ten (10) minor parties on the ballot with NPA candidates and major party candidates.  From 2000 to 2012, there have been three (3) different minor parties on the ballot with "Socialist" or "Socialism" in the name.  *See supra* n.3.  If Florida's ballot access methods were any more lenient, there would only be more.

### 3.  Florida's Alternative Access Methods Serve its Interests

Third, "[i]n passing judgement," the Court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 780.  "States are free to adopt differing means of regulating ballot access, as long as the particular scheme is not unnecessarily burdensome." *Libertarian Party of Fla.*, 710 F. 2d 790, 793 (11th Cir. 1983).  "[L]esser burdens…trigger less exacting review."  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).  Indeed, when only "reasonable, nondiscriminatory restrictions" are imposed upon the rights of voters, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Anderson*, 460 U.S. at 788.

The Eleventh Circuit has upheld Florida's previous 3% petition requirement for statewide and local candidates as "a rational way to meet" the same "compelling state interest" Florida has put forth here. *Libertarian Party of Fla. V. Fla.*, 710 F. 2d 790, 793 (11th Cir. 1983); *Swanson v. Worley*, 490 F. 3d 894, 903-04 (11th Cir. 2007) (relying on lessor scrutiny set in *Libertarian Party* in again upholding a 3% threshold (Alabama)). The Court should do the same here as to both of Florida's alternative methods because they are not only "rationally related to," but directly further its interests in requiring a significant modicum of support proportionate to its large population and significant share of presidential electors.

Minor parties in Florida are those that, among other things, "which on January 1 preceding a primary election does not have registered as members 5 percent of the total registered electors of the state." § 97.021(19), Fla. Stat.  Less than five percent of the registered electors in the state is not indicative of a significant modicum of support.  The alternative petition method therefore requires minor parties to gather signed petitions from 1% of the registered electors in the state who would like to see that party on the ballot.  This threshold is within the range of petition requirements upheld by the Supreme Court and the Eleventh Circuit as sufficiently justified by the well-recognized interests in requiring a significant modicum of support.  *E.g. Libertarian Party of Fla. v. Fla.*, 710 F. 2d 790 (11th Cir. 1983); *Cartwright v. Barnes*, 304 F. 3d 1138, 1140 (11th Cir. 2002)

(upholding Georgia's same 5% threshold within 6-month period that was upheld in by the Supreme Court in *Jenness*).   Indeed, in *Burdick*, the Supreme Court noted that on at least three prior occasions, it had previously upheld "petition signature requirements that were as burdensome or more burdensome than Hawaii's one percent requirement." 504 U.S. 428, n.3 (1992).  And in *U.S. Taxpayers of Florida v. Smith*, 871 F. Supp. 426, 423-33 (N.D. Fla. 1993), *this* Court made the same observation when upholding the *same* 1% threshold for minor parties to access the presidential ballot at issue here.  "The Supreme Court has previously upheld party and candidate petition signature requirements that were as burdensome or more burdensome than Florida's one percent requirement."  *Id.*, *aff'd mem.*, 51 F. 3d 241 (11th Cir. 1995).

Minor parties are defined only by their status in Florida.  In order to account for whatever "national interest" there may be in presidential elections, Florida therefore allows minor parties to show a significant modicum of support *nationally*, through affiliation with a national party.  The Secretary does not determine whether or not a minor party is in fact so affiliated.  The affiliation requirement only requires the minor party to certify to her that it is indeed affiliation with a national party.  She must take that certification at face value.  How the FEC determines national status, based on Plaintiffs' own showing, seemingly requires a sufficient showing of a significant modicum of national

support.  Indeed, Plaintiffs describe the national affiliation method as "really amount[ing] to significant support *outside* of Florida."  (DE 9 at 31-32). Specifically, by requiring the party to first place its candidates "on the ballot in several states" and be "organized across the nation."  (DE 9 at 23).  Plaintiffs expert even opines that this is so. (DE 9-1, ¶¶ 19-21).

Plaintiffs' point that national affiliation does not have any "logical correlation to showing any modicum of electoral support in *Florida*," is therefore beside the point.  (DE 9 at 33) (emphasis added); *id.* at 20 (Florida support is unrelated to FEC's determination); *id.* at 23 (FEC does "not consider[] particular states' interests").  Florida offers the alternative petition method for minor parties to show *Florida* support.

Plaintiffs otherwise focus primarily on one interest – preventing a "confusing and unwieldy ballot."  (DE 9 at 14); *id.* at 4-5 ("the sky did not fall and voters were not befuddled over the number of choices on the ballot"); *id.* at 8 ("the number of candidates based on actual experience are not so numerous to make a typical voter confused or make it difficult for them to locate their candidate of choice").  Preventing a lengthy ballot is only *one* part of a state's well-recognized interests in requiring a significant modicum of support.  *See* (Matthews Decl.). More meaningful here may be that the "function of the election process is 'to winnow out and finally reject all but the chosen candidates,' … not to provide a

means of giving vent to 'short-range political goals, pique, or personal quarrels.'"

*Burdick*, 504 U.S. 428, 438 (1992) *quoting Storer*, 415 U.S. at 735.

Plaintiff Party for Socialism and Liberation has existed for 12 years, yet has only 683 members. Req. for Jud. Ntc. ¶¶ 5, 7.  Over its 12 years, it has raised a total of only $6,566 in contributions.  Req. for Jud. Ntc. ¶ 6.  Plaintiff Independent Party has existed for at least 24 years and has 106,580 members, yet it has raised a total of only about $19,378 in contributions in the 21-year period of the Divisions' records.  Req. for Jud. Ntc. ¶¶ 2-3, 7.  The fact that it even has over one hundred thousand members may be more about voter registration applicants confusing "independent," *i.e.* "NPA," and being a member of the Independent Party, than wanting to register as *any* party's member.  (Matthew Decl. ¶¶ 5-7).  Plaintiffs have not placed candidates on the ballot in any other race.  There is a dearth of evidence that they even have the internal structure to do so.  *See* (DE 20-2) (corrected Bach Decl.); (DE 9-8) (Ellis Decl.).  Nor is there evidence that Plaintiffs engage in any significant party activity like voter registration or any form of candidate campaigning.  *Id.*

Plaintiffs also just use the wrong level of scrutiny in analyzing their claims. They argue that because the alternative access methods are allegedly "not narrowly tailored" to further Florida's interests, the Plaintiffs are likely to succeed.  (DE 9 at 34).  "Strict scrutiny is not triggered by the existence of a less burdensome

restriction—it is triggered only when the challenged regulation itself imposes a severe burden." *Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944, 946–47 (7th Cir. 2019).  Under lesser scrutiny, what is "unnecessarily burdensome" is not measured by the "least drastic means test," but rather, by whether the requirement is a "rational way" to meet the stated interests.  *Libertarian Party of Florida v. State of Fla.*, 710 F.2d 790 (11th Cir. 1983).  Florida's access alternatives do at least that.

### 4.   The Weight of Authority Goes Against Plaintiffs' Best (But Distinguishable) Case

Against the weight of authority upholding ballot access schemes that are as or more burdensome than Florida's, Plaintiffs cite *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340 (N.D. Ga. 2016), *aff'd mem.* 674 Fed. Appx. 974, 2017 WL 429257 (11th Cir. 2017).  (DE 9 at 9-10, 13, 19, 28-29).  *Green Party* is a district court decision invalidating Georgia's 1% petition requirement that was affirmed by the Eleventh Circuit in a one-line, unpublished memorandum affirmance.  In *Green Party*, the district court applied strict scrutiny upon a particular finding that cannot be made here.

Georgia's ballot access restrictions are distinguishable.  Georgia required signatures be collected within 180 days.  *Green Party*, at 1347.  Here, minor parties have four years.  Petition circulators in Georgia also had to, "on each sheet" of the petition, subscribe and swear before a notary public that the signatures were

24

in fact collected within that window.  *Green Party*, at 1347.   Additionally, the

court found that "[s]ince 2000, no independent or third-party candidate ha[d]

qualified by petition" in Georgia.  *Id*. at 1347.  Candidates were actively trying and

failing despite significant national support and placement on many other states'

ballots.  Ralph Nader, for example, was on the ballot in 45 other states – including

Florida – in the 2008 election, but could not achieve access under Georgia's

scheme.  Here, Plaintiffs concede that many and varied minor parties regularly

appear on Florida's ballot.

The court in *Green Party* did not evaluate the Eleventh Circuit's opinions in

*Libertarian Party*, *Swanson, Cartwright*, or *U.S. Taxpayers* either.  No more than

short shrift was given to any of those cases.  Importantly, when deciding to apply

strict scrutiny – a finding that largely determines the outcome – the court expressly

"look[ed] to the decisions of the Sixth and Ninth Circuit Courts of Appeals," but

even then, only those opinions that found *strict* scrutiny to be appropriate.  *Green

Party*, 171 F. Supp. 3d at 1363-64.  And significantly, the Ninth Circuit Court of

Appeals in *De La Fuente v. Padilla* later affirmed a district court decision that

upheld California's 1% signature requirement, and where the district court

expressly distinguished *Green* based on the effect of the Georgia regulations being

a "consistent dearth of presidential candidates from outside of the Democratic and

Republican parties" on the ballot in Georgia, which was not the case in California.

25

*See De La Fuente v. State*, 278 F. Supp. 3d 1146, 1154-55 (C.D. Cal. 2017), *aff'd De Le Fuente v. Padilla*, 930 F. 3d 1101 (2019).[9]  The appellate court agreed with the district court's analysis in a written analysis of its own, stating "[t]he inclusion of minor party candidates also distinguishes this case from others where courts have applied strict scrutiny. *See, e.g.*, *Green Party of Georgia v. Kemp*…".  *De La Fuente*, 930 F. 3d at 1106.

The court in *Green Party* did evaluate the Eleventh Circuit's decision in *Stein* upholding Alabama's 3% petition threshold.  *Green Party*, 171 F. Supp. at 1170-72.  But the court in *Green Party* distinguished Georgia's 1% threshold under review because unlike Alabama's generous time frame for collection, Georgia required collection "within 180 days."  171 F. Supp. 3d at 1371-72.  Florida allows collection within 4 years, making it more akin to Alabama's requirement that was upheld under lesser scrutiny than Georgia's requirement.  "More importantly," the court in *Green Party* found, minor parties were able to and did access Alabama's ballot.  171 F. Supp. 3d at 1371.  "Thus, Alabama's law does not implicate *Anderson's* 'primary concern,' viz., 'the tendency of ballot access restrictions to limit the field of candidates from which voters might choose'" the court concluded.  "But that is precisely *this* Court's concern with Georgia's ballot

---

[9] The *De La Fuente* district court decision is discussed further below as it relates to the additional similarity of lack of effort in utilizing available channels by the candidate seeking access.

access restriction. In *Stein*, the voters of Alabama were not burdened in the same way as Georgia voters. Alabama voters were still able to vote for candidates outside the two major parties." *Green Party*, 171 F. Supp. 3d at 1371.  On this point too, Florida's petition threshold is like that of Alabama's.  Voters' choice is plentiful in Florida.

The barriers to Plaintiffs' ballot access may be more attributable to their deficiencies as a party than Florida's challenged access alternatives.  Indeed, their lack of volunteer support and financial contributions, even from members, are a good indication that they ultimately lack a modicum of support necessary for ballot placement.  Plaintiffs are not at all likely to succeed on the merits.

**B. Potential Harm to the Defendant Outweighs the Injury to Plaintiffs, Which is Not Irreparable Here**

Plaintiffs' harm, given that they simply do not *want* to affiliate with a national party or rely upon member or volunteer petition gatherers, and have *not even tried* to do so, is $100,000.  That is because Plaintiffs' harm is caused by their choices, not any requirement imposed by the state.  *See De La Fuente v. State*, 278 F. Supp. 3d 1146, 1152-53 (C.D. Cal. 2017), *aff'd* 930 F. 3d 1101 (2019).

In *De La Fuente*, the district court evaluated much of the same circumstances present here, when determining whether California's same 1% petition requirement and its 110-day collection window were valid.  Indeed, the

27

plaintiff candidate in that case, "Rocky" De La Fuente,[10] like Plaintiffs here, "decided against even attempting to collect signatures" because it was allegedly cost prohibitive and made no effort to enlist volunteer circulators. *Id*. at 1152-53. Also like Plaintiffs here, De La Fuente collected insignificant contributions. *Compare id.* at 1153 ($17,215.13) *with* (IND Finance) ($3,000 collected by Independent Party since the 2016 General Election) *and* (PSL Finance) ($3,600 collected by Party for Socialism since the 2016 General Election).  The district court therefore found that the "barriers" to De La Fuente accessing California's presidential ballot, were "deficiencies in his candidacy," most prominently a lack of voter interest and enthusiasm," and not the challenged laws. *Id.* at 1153.  This, the district court concluded, was not the state's concern; it was "under no obligation to provide [De La Fuente] with an easy path to the general election ballot or to help him overcome" those deficiencies. *Id.*

Likewise, Plaintiffs' harm here is therefore not the generally irreparable harm of denial of ballot access, because their harm is not caused by the state.  To be sure, Florida is "not burdened with a constitutional imperative to reduce voter apathy or to 'handicap' and unpopular candidate to increase the likelihood that the candidate will gain access to the general election ballot." *Munro v. Socialist*

---

[10] De La Fuente was *on* Florida's presidential ballot in the same year at issue in that case – 2016.

*Workers Party*, 479 U.S. 189 (1986).  Plaintiffs' alleged harm is due more likely a

lack of voter enthusiasm or internal motivation than to the challenged access

methods, and amounts to, at most, the $100,000 they estimate it would take to get

on the ballot.

Weighed against that harm is the harm to voters, other candidates and parties

in having two parties on the ballot that have made no showing to support ballot

access.  *See supra*.  Plaintiffs do not want to affiliate with a national party.  Nor do

they want to even try to gather petitions.  Plaintiffs have collected only

insubstantial contributions throughout their existence and there is a dearth of

evidence that they even engage in the traditional functions of a political party, or

even have articulable platforms from which to derive political change or govern.

Moreover, voters could simply confuse "IND," the abbreviation on the ballot for

Plaintiff Independent Party, the way they regularly confuse "Independent" for

"NPA" when choosing a party for their voter registration.  (Matthews Decl. ¶¶5-7).

This may further exacerbate the "party raiding" Florida has an interest in

preventing, in order to ensure the winner is the preference of a majority and to

maintain political stability.  *See e.g. Storer v. Brown*, 415 U.S. 724, 731 (1974);

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 352 (1997). These latter

harms are substantially more than Plaintiffs' harm.  Plaintiffs' harm does not

therefore outweigh the Secretary's harm.  The reverse is true, and greatly so.

**C. Preemptively Placing Plaintiffs' Candidates on the Ballot Disserves the Public Interest**

The public has a right to some assurance that the candidates on the ballot have first shown a significant modicum of support.  *See supra.*  Granting Plaintiffs access to the 2020 General Election Ballot *without* that assurance wholly undermines that important interest.  It also creates additional harm to the public identified in section B.  Moreover, the result would be to allow two completely unknown candidates to be placed there with Plaintiffs.  Plaintiffs have not offered who exactly their candidates will be and it is therefore impossible to know whether they themselves could even make the necessary showing of support.  This just further exacerbates the disservice to the public interest.

**III.   CONCLUSION**

WHEREFORE, the Secretary respectfully requests this Court deny Plaintiffs' Motion for Preliminary Injunction (DE 9).

Respectfully submitted,

*/s/ Ashley E. Davis*
BRADLEY R. MCVAY (FBN 79034)
*General Counsel*
brad.mcvay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48032)
*Deputy General Counsel*
ashley.davis@dos.myflorida.com
candice.edwards@dos.myflorida.com
COLLEEN O'BRIEN (FBN 76578)
*Assistant General Counsel*
colleen.obrien@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building, Suite 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Phone: (850) 245-6536
Fax: (850) 245-6127
*Counsel for Secretary of State*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(F), the undersigned certifies that this filing contains 7364 words according to the word-processing system used to prepare it, excluding portions that do not count toward the limit.  This filing also conforms to the format requirements of Local Rule 5.1(C).

*/s/ Ashley E. Davis*
ATTORNEY


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served to all counsel of record through the Court's CM/ECF system on this 22d day of May 2020.

*/s/ Ashley E. Davis*
ATTORNEY

Tab 35

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

---

|  |  |  |
|---|---|---|
| INDEPENDENT PARTY OF FLORIDA and PARTY FOR SOCIALISM AND LIBERATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Case No. <u>4:20-cv-00110-MW-CAS</u> |
| LAUREL M. LEE, Florida Secretary of State, in her official capacity, | ) ) ) ) | |
| Defendant. | ) ) ) | |

---

## REPLY IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

COMES NOW Plaintiffs The Independent Party of Florida ("Independent Party") and The Party for Socialism and Liberation ("Party for Socialism"), by and through their attorney of record, Daniel J. Treuden, to respectfully file this reply in support of their motion for preliminary injunction. This paper is filed pursuant to N.D. Fla. Loc. R. 5.1 and 7.1.

Most of the arguments set forth in Laurel Lee's Opposition Brief are adequately addressed by the Plaintiffs' Motion for Preliminary

1

Injunction. There are some arguments, however, that require addressing, primarily to put certain facts in a proper context.

## I.   Both Parties Have Standing Because Even Minor Political Parties that Gain Access to the Ballot by Signature Petition Are Not Required to Name the Candidate Prior to Circulating the Petition.

Minor political parties must circulate Form DS-DE 18B to have its presidential candidate nominee placed on the ballot using the signature petition method. A copy of this form is attached as Exhibit A. It can be downloaded from the internet from the following web address:

https://dos.myflorida.com/media/693250/dsde18b.pdf. As can plainly be seen on the form, the only information required to be set forth is the personal information of the registered voter, the name of the minor political party seeking ballot access, and the year of the presidential election. As for the minor political parties proceeding under the affiliation method of ballot access, they must certify their candidates by September 1, 2020. Fla. Stat. ¶ 103.021(4)(a).

The Party for Socialism and Liberation has chosen Gloria La Riva to be its Presidential candidate. (Decl. of Bryan Ellis, ¶ 1.) Regarding The Independent Party of Florida, they have not yet chosen their nominee. They have received interest from a number of potential

candidates and are currently in the process of narrowing their search of those potential candidates. (Decl. of Ernest Bach, ¶ 2) (hereinafter "Bach Decl.").

Regarding the signature petition method of ballot access, the deadline to present the petitions to the Boards of Supervisors has not yet arrived. Fla Stat. § 103.021(4)(b) requires that these be presented by July 15, 2020, and if the Plaintiffs prevail on the signature petition aspect of this case which would result in a lower signature amount, the Plaintiffs very well may pursue this method of ballot access.

Based on the foregoing points, both parties have a concrete injury they seek to remedy. They both will either be barred from placing their chosen candidates to the presidential ballot by certification or will be forced to conduct a signature petition that requires an unconstitutional amount of signatures.

## II. The Independent Party of Florida's Bylaws Do Not Destroy its Standing.

The Independent Party's bylaws do in fact set forth a method of obtaining its electors and cites to Fla. Stat. § 103.021(4)(b). This bylaw, however, merely tracks the language of an unconstitutional statute. Most importantly, when this bylaw was presented to the Department of

State in 2011, the Independent Party actually cited to both Fla. Stat. § 103.021(4)(a) and (4)(b). It was the Department of State that required the Independent Party to amend its bylaws to omit any reference to Fla. Stat. § 103.021(4)(a) before they would be accepted by the Department of State. (Bach Decl., ¶¶ 6-8.) The Independent Party always intended to obtain ballot access in any legal way possible.

## III. The Party for Socialism and Liberation Bylaws Do Not Destroy its Standing.

The Party for Socialism and Liberation's bylaws states that it is associated with a "national party." The term as it is used in the bylaws is using the common definition of national party, not the statutory definition. The statutory definition requires that the minor political party be associated with a national party that is recognized by the Federal Election Commission as a qualified national committee. Fla Stat. § 103.021(4)(a). The Party for Socialism and Liberation has standing because it is not associated with national party as that term is used in the Florida affiliation statute.

## IV. The Plaintiff Parties Lack of Desire to Associate With a National Party, or a Lack of Desire to Associate With a Party that is Recognized by the FEC as a Qualified National Committee Does Not Destroy Standing.

The Independent Party has expressed no desire to associate with a national party instead opting to retain the ability to associate with and nominate whatever candidate they choose each presidential election cycle. (DE. 20-2, ¶ 8.) One of the main tenets of the Independent Party is that they are not beholden to any other party or organization and can truly pursue their own path. With 3,620,513 people currently registered in Florida as "No Party Affiliation," there is a large base of people to which they can market this idea. (DE. 33-7.)

The Department of State decertified the Independent Party at the end of 2016 when they party had 262,599 registered voters. The Independent Party had to start the recruitment process over and they now have 106,580 registered voters, more than twice the amount of all other minor political parties combined. (DE. 33-7; Bach Decl., ¶ 5.) This desire to remain independent is a fundamental associational right because the right to associate also includes the right not to associate:

> [T]he Court has recognized that the First Amendment protects 'the freedom to join together in furtherance of common political beliefs,' . . . which 'necessarily presupposes

the freedom to identify the people who constitute the association, and to limit the association to those people only.' . . . That is to say, **a corollary of the right to associate is the right not to associate**.

*California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (internal citations omitted) (emphasis added).

Similarly, the Party for Socialism and Liberation has a right to associate with the national party of its choice. The suggestion that the Party needs to justify some basis for not associating with the national Socialist Party is not a basis upon which one could find a lack of standing. (DE 34, pp. 6-7.) According to the Socialist Party's website, they are nominating Howie Hawkins as the Presidential candidate. *See* https://www.socialistpartyusa.net (last accessed on May 28, 2020). The fact that the Party for Socialism and Liberation intends to nominate someone else, namely Gloria La Riva, is reason enough not to associate with the national Socialist Party. The desire or lack thereof to associate with someone else is the crux of the First Amendment's right to associate, and consequently, setting forth the parties' desires is a sufficient basis to establish standing.

Both Plaintiff parties challenge the affiliation rule because the rule is not designed to further the state's interests in regulating the election

and the presidential ballot. The affiliation rule sets a standard that measures non-Florida support for a political party, and if that standard is met, allows the minor party to forego establishing any modicum of Florida-based support.

## V.  The Independent Party of Florida's Registered Voter Count is not "Accidental."

Attorney Maria Matthews set forth an affidavit in which she asserts a belief that some voters did not intend to become Independent Party registrants. (DE. 34-1, ¶ 5.) She advises that some people may write "Independent" in the minor party line intending to be "no party affiliation." *Id*. She also references a rule development workshop from August 6, 2019. This workshop can be found online at:

https://thefloridachannel.org/videos/8-6-19-division-of-elections-rule-development-workshop/. The discussion she refers to begins at the 2:16 point in the video and lasts for about 7 minutes.

The Independent Party of Florida believes Attorney Matthews' concerns are overstated. Attached as Exhibit B is a copy of the Florida Voter Registration Application. As can be seen in the lower left hand corner, a person must forego the "No Party Affiliation" option, choose "Minor Party," and print the name "Independent" or a variation of that

on the blank line. That is not something that would be frequently be
done on an accidental basis.

## VI. Richard Winger's Quotation from *De La Fuente v. Padilla* was Misconstrued.

In *De La Fuente v. Padilla*, 930 F.3d 1101, 1105-06 (9th Cir. 2019),
the Plaintiffs' expert Richard Winger was quoted in the record as saying
"there's almost nobody left to petition," using that quote to hold that
Mr. De La Fuente's ballot access case could appropriately be denied
because voters already had a sufficient choice among both major and
minor partisan candidates. (Decl. of Richard Winger, ¶ 2.) Mr. De La
Fuente had attempted to gain the Democratic nomination in 2016, and
having failed that decided to run as an independent. *Id.* ¶ 3. In the 2016
California presidential election, there were only three minor parties on
the ballot (not counting the American Independent Party that
nominated Donald Trump along with the Republican Party). *See*
https://elections.cdn.sos.ca.gov/sov/2016-general/sov/2016-complete-
sov.pdf, p. 5 (last accessed on May 29, 2020).

Mr. Winger's comment regarding "there's almost nobody left to
petition" was a statement made in a deposition referring to the 1996
and 2000 presidential elections when California had eight minor party

8

candidates on the Presidential election ballot. (Winger Decl., ¶ 4.) The point was made to show that when there are more minor parties on the ballot, there's usually fewer independent candidates because the independent candidates are more likely to find a minor party they can work with to gain ballot access. The Plaintiffs' claims in this case do not involve independent candidates.

**VII.   Regarding Ballot Access Statistics, Plaintiff's Expert did not Miss a Relevant Ballot Access Signature Campaign in his Analysis.**

The Plaintiffs' expert Richard Winger put forth a chart in support of the Motion for Summary Judgment found at DE. 9-4. That chart involved minor party and independent candidate signature campaigns. Kendrick Meek was the Democratic nominee, not a minor party candidate nominee. (Winger Decl., ¶ 5.) Regarding the Libertarian Party candidate in 1996, both the Libertarian and Reform Party candidates met the 1% signature requirement that year, but that year required only 65,596 signatures, which is approximately half of the current required amount. *Id.*, ¶ 6. The point of the chart was to give each state's largest successful signature campaign by a non-major party candidate. As populations increase, percentage-based signature

requirements become harder and harder to achieve, which is why Mr.

Winger was able to opine that only one time in history has a minor

party or independent candidate achieved ballot access in a state by

successfully obtaining more signatures than Florida's current

requirement of 132,781. (DE 9-1, ¶ 42.)


Dated this 29th day of May, 2020.

Respectfully submitted,

**THE BERNHOFT LAW FIRM, S.C.**
Attorneys for Plaintiffs


By: /s/ Daniel J. Treuden
Daniel J. Treuden
Admitted *pro hac vice*

1402 E. Cesar Chavez Street
Austin, Texas 78702
telephone: (512) 582-2100
facsimile:  (512) 373-3159
djtreuden@bernhoftlaw.com

## CERTIFICATE OF SERVICE

The foregoing document was served on the Defendant by the ECF

system at the time of filing:

ashley.davis@dos.myflorida.com
Deputy General Counsel Ashley E. Davis

Attorney for:
Laurel M. Lee, Florida Secretary of State
R.A. Gray Building
500 S. Bronough Street
Tallahassee, Florida 32399

Signed this 29th of May, 2020.

  /s/ Daniel J. Treuden
Daniel J. Treuden

# Tab B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
INDEPENDENT PARTY OF FLORIDA      )
and PARTY FOR SOCIALISM AND       )
LIBERATION,                       )
                                  )
              Plaintiffs,         ) Case No: 4:20cv110
                                  )
         v.                       ) Tallahassee, Florida
                                  ) June 5, 2020
LAUREL M. LEE, SECRETARY OF       )
STATE, in her official capacity,  )
                                  ) 9:00 AM
              Defendant.          )
_____  )
```

**TRANSCRIPT OF TELEPHONIC PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 54)**

<u>APPEARANCES</u>:

```
For the Plaintiffs:      The Bernhoft Law Firm
                         By:  DANIEL J. TREUDEN
                              Attorney at Law
                              djtreuden@bernhoftlaw.com
                         1402 East Cesar Chavez Street
                         Austin, Texas 78702


For the Defendant:       Florida Department of State, Office of
                         General Counsel
                         By:  ASHLEY E. DAVIS
                              Attorney at Law
                              ashley.davis@dos.myflorida.com
                         500 South Bronough Street, Suite 100
                         Tallahassee, Florida 32399


Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         850.422.0011 megan.a.hague@gmail.com
```

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

```
 1                    P R O C E E D I N G S

 2        (Call to Order of the Court at 9:00 AM on Friday, June 05,

 3   2020.)

 4              THE COURT:  Good morning.  This is Judge Walker.

 5   We're here in Case No. 4:20cv110.  We're here on plaintiffs'

 6   motion for preliminary injunction, ECF No. 9.

 7              Do I have my court reporter on the line?

 8              THE COURT REPORTER:  Yes, Your Honor, you do.

 9   Good morning.

10              THE COURT:  Good morning.

11              Do I have my courtroom deputy on the line?

12              THE COURTROOM DEPUTY:  Yes, Judge.

13   Good morning.

14              THE COURT:  Do I have my law clerk on the line?

15              THE WITNESS:  Yes, Judge, I'm here.

16              THE COURT:  Do I have counsel for the plaintiffs on

17   the line?

18              MR. TREUDEN:  Yes, Your Honor, Daniel Treuden

19   appearing on behalf of the plaintiffs.

20              THE COURT:  Welcome.

21              Do I have counsel for the defendant on the line?

22              MS. DAVIS:  Yes, Your Honor.  Ashley Davis on behalf

23   of the Secretary of State.

24              THE COURT:  Welcome.

25              What I would now ask is for everybody to please put --
```

1  we don't seem to be experiencing the technical problems I had on

2  Wednesday when I conducted a hearing on another motion for a

3  preliminary injunction in another case, but please put your

4  phones on mute when you're not speaking.  And, also, if you're

5  on speaker, please take the phone off speaker.  Those two things

6  tend to create static on the line, and the court reporter needs

7  to make a good record today.

8        Each time you speak, for the benefit of the court

9  reporter, please identify yourself.

10        As I indicated at the telephonic hearing when I set

11  this hearing, I'll -- we'll proceed as follows:

12        I'm going to ask a series of questions.  Each time I

13  ask one side a question, I'll certainly give the other side an

14  opportunity to reply.  Once I've gone through with my questions

15  and answers, we'll take a break, and then I'll -- we'll come

16  back, and I'll give both sides an opportunity to sum up their

17  positions.

18        I find that it's more useful for you, as counsel, to

19  know what my concerns are before you then just leap into your

20  arguments.  So, again, that's how we'll proceed this morning.

21        Let me pause here.  I don't need to take a roll call

22  to see who else is on the line.  This is a public proceeding.

23  We identified the phone numbers and the access numbers and the

24  security code online on the notice.  If we have members of the

25  press or anyone else listening in, that's all well and good, but

1  I'll remind you that this is a federal proceeding, and you may

2  not record these proceedings.  So you -- to the extent anybody

3  has started any recording device, you need to shut it off

4  because you may not record these proceedings.

5          The parties have submitted papers in support of their

6  motions and memorandums and have provided additional documents,

7  including declarations for this Court's review.  I have reviewed

8  all the papers and all the attachments in anticipation of

9  today's hearing.  I would hope that that would be a given, but

10  I'll note that I have, indeed, reviewed all the papers.

11          On occasion I will start the hearing by trying to turn

12  the volume down by applauding the lawyers for their efforts.  In

13  some cases that's, quite frankly, a bit disingenuous because the

14  papers that have been filed are not very good.  In this case I

15  mean it with all sincerity.

16          Mr. Treuden and Ms. Davis, you've made my job a lot

17  easier.  Your work is excellent in this case, and it has been

18  extremely helpful to me and would be extremely helpful to any

19  reviewing court.  Your arguments are thoughtful and concise.

20  You've avoided a bunch of hyperbole, and you've addressed the

21  issues that are before this Court head on.  So I thank you for

22  your hard work and professionalism.

23          Before I start the questioning, I will note that I had

24  the parties, as you're well aware, file supplemental briefing

25  as -- on the issue of whether the Eleventh Circuit's decision in

1    *Jacobson* impacts standing in this case as it relates to whether

2    plaintiffs' injury is traceable and redressable by the

3    defendant.

4            I entered an order acknowledging that supplemental

5    briefing, ECF No. 30.  In issuing that order, I was not

6    suggesting that the defendant was foreclosed from making any

7    other standing argument.  I don't think that order can be fairly

8    read to mean that.  I was simply acknowledging that I agreed

9    with the parties that *Jacobson* and -- did not in any way

10   undermine plaintiffs' position that the plaintiffs had standing

11   as to that narrow aspect of standing.  I certainly understand

12   that the -- there are other issues.  The defendant has raised

13   those other issues, and I will address those.  So no one should

14   have read anything into ECF Document 30 beyond the very narrow

15   question that I've asked the parties to brief.

16           We'll come back to standing.  I want to go ahead and

17   jump into it, and I'm going to have a series of questions tied

18   to likelihood of success on the merits.

19           Before I do that, does the plaintiff wish to be heard

20   on defendant's request for judicial notice as it relates to

21   prior election data, ECF No. 33?

22           MR. TREUDEN:  No.  I mean, I'm fine with the Court

23   taking judicial notice of those items.

24           THE COURT:  All right.  This Court -- and, again,

25   you've had -- Mr. Treuden, your papers are very good, and if you

```
 1    had had a problem, I assumed you would have notified the Court,

 2    but I just wanted to clarify that on the record.

 3            So, Ms. Davis, I do take judicial notice as requested

 4    in ECF Document No. 33.

 5            Before I get to likelihood of success on the merits,

 6    Ms. Davis, let me ask you -- and I'm going to have some

 7    challenging questions for Mr. Treuden on success on the

 8    merits -- likelihood of success on the merits.  But as it

 9    relates to the other three factors for a preliminary

10    injunction -- and it doesn't mean that those three factors

11    aren't important.  I routinely deny motions for preliminary

12    injunction finding, for example, there's no irreparable harm,

13    but in this setting, if this -- if I were to find consistent --

14    that if I was -- based on substantial likelihood of success on

15    the merits -- and, please, I'm not telegraphing anything and

16    suggesting I am going to do that; but if I were to find in the

17    plaintiffs' favor in this case as to that factor for purposes of

18    a preliminary injunction -- again, I'm not suggesting I am, but

19    I just want to go ahead and address this up front.

20            If I were to find there were a severe burden in this

21    case, how in the world would I find in favor of the defendant as

22    to the other three factors?  And has a court, where they found a

23    severe burden, ever found in favor of a defendant as to those

24    other three factors in an election case such as this, meaning

25    the type of issue that's before this Court?
```

1          And that doesn't mean Mr. Treuden wins.  As I said,

2     I've got some serious questions on likelihood of success on the

3     merits, but -- and I'm most troubled by that, but I'm just

4     trying to figure out, if I found a severe burden, how would I

5     find that any one of those other three factors were not

6     established by the plaintiff?

7          MS. DAVIS:  Your Honor, thank you.  This is, again,

8     Ashley Davis on behalf of the Secretary.

9          If you were to find that there was a severe burden,

10    the case law recognizes that that first step of the *Anderson*

11    test is pretty much the beginning and end of the analysis, if

12    you find that it's a severe burden, I don't know, sitting right

13    here, right now of a case that's been -- found the other factors

14    weighed in favor of keeping the party off the ballot.

15         THE COURT:  And I understand -- and just to follow up,

16    any additional argument from the government that if I were to

17    find that -- and I'm not suggesting I am -- as to any one of

18    those other three factors, why it would still weigh against the

19    issuance of an injunction in this case?

20         MS. DAVIS:  As to Florida specifically, we've

21    introduced evidence through Director Matthews' affidavit that

22    there would be a severe amount of confusion, and often is, when

23    a candidate or, in this case, a party and their candidates are

24    put on the ballot and then possibly removed by appeal after

25    ballots are printed.

1          THE COURT:  Ms. Davis, I understand that, and I've

2    heard Ms. Matthews say similar things in a large number of

3    election cases, many of which your office has won and a few of

4    which they've lost, but I'm troubled by that argument in the

5    sense that how would we ever then have an election case?

6    Because your office takes the position there's no standing; it's

7    not ripe; it's too early; toss the case, Judge Walker.  And then

8    when somebody files something, and then you can't really make

9    the argument that it's not ripe, then you argue, Judge, if you

10   rule in their favor, you'll destroy the election process and

11   undermine a free and fair election in Florida.

12          So it seems to me that it's -- in these types of

13   cases, if that's the analysis, it's heads, you lose; tails you

14   lose; we can never have an election challenge in Florida.  Help

15   me to understand why that's not so.  And I don't want to get too

16   bogged down on this because I think this is sort of a tangential

17   or less significant issue, but I do want you to address that

18   briefly.

19          MS. DAVIS:  Yes, Your Honor.  And I don't think it's a

20   heads-you-lose-tails-you-lose situation.  I would drop back to

21   the standard and the purpose of a preliminary injunction, and

22   that's the standard that we're here on today.  That's the stage

23   of these proceedings, and that's merely to preserve the relative

24   position until a trial on the merits can be held.

25          It's an extraordinary and drastic remedy.  And in this

1  instance, rather than preserving the status quo for trial,

2  plaintiffs sneaks up in that status quo.  So I think there is a

3  fundamental difference when we're here in front of the Court on

4  preliminary relief before an election, rather than a summary

5  judgment motion or a full trial on the merits; that plaintiff

6  has a much greater burden and a likelihood of success is still

7  just that.

8          THE COURT:  Well, let me try it a different way,

9  Ms. Davis.

10         If this case had been filed a year and a half ago,

11  giving us ample time to address on the merits, would it have

12  been ripe?

13         MS. DAVIS:  Yes, it would have been ripe.  If

14  plaintiffs alleged that they intended to seek ballot access for

15  this 2020 election, they could have been petitioning four years

16  ago.

17         And I want to make clear that the election passing,

18  regardless of the relief, in these types of ballot access

19  challenges, as long as the plaintiff fully intends to seek

20  ballot access again, then we're not going to lose jurisdiction,

21  and we can continue on summary judgment motions or a full trial

22  on the merits and get down to a final and full determination of

23  this issue.

24         THE COURT:  All right.  I understand your response.

25  Let me pause there and turn to Mr. Treuden.

```
 1              And I'm not sure as it relates to the other three

 2    factors, if I found there's a severe burden, what else you want

 3    to add at this point, but I'll give you an opportunity to be

 4    heard on that.

 5              MR. TREUDEN:  Oh, yes, thank you, Your Honor.  Daniel

 6    Treuden on behalf of the plaintiff.

 7              I view this -- on those issues, the severe -- we have

 8    an opportunity here to avoid the severe burden placed on these

 9    candidates as to the application of those statutes.

10              Regarding the ballot printing and things like that, I

11    saw that and didn't understand how that affects the timeliness

12    right now because the minor party candidates -- and even if

13    you're proceeding by signature petition, the deadlines haven't

14    come up yet, so the Secretary --

15              THE COURT:  Oh --

16              MR. TREUDEN:  -- does not know who's going to be on

17    the ballot again.

18              THE COURT:  Mr. Treuden, let me make plain so there's

19    no confusion, it was a shot across my bow in suggesting, Judge,

20    if you were so foolish as to enter an injunction, we're going to

21    get you reversed at the Eleventh Circuit, and they may not

22    reverse you until the ballots are already printed.  And that's

23    the confusion.  I think that's a fair --

24         (Indiscernible crosstalk.)

25              MR. TREUDEN:  Oh, okay.  And I guess I -- I mean, we
```

```
 1   timed this, you know, when I finally had this case and did my
 2   best to get this filed as quickly as I could.  And we did -- we
 3   filed the preliminary injunction quickly so that we would have
 4   time to seek expedited appeals before the Eleventh Circuit and,
 5   with the September 1st deadline, notified the Secretary of State
 6   for parties that are proceeding -- minor parties that are
 7   proceeding under the affiliation clause.
 8           I have all the confidence that the Eleventh Circuit is
 9   going to be able to consider any ruling of this Court within --
10   you know, by August sometime so that this won't be an issue.
11   That's my thought on that.  I don't think the timeliness issue
12   is a factor, a big one.
13           THE COURT:  Well, both in the ballot order placement
14   case and the Fourth Amendment case that my colleague,
15   Judge Hinkle, worked on, it appears that the Eleventh Circuit
16   has expeditiously moved to resolve election case challenges.
17   They've just done that this year in two cases swiftly; is that
18   correct?
19           MS. DAVIS:  Yes.
20           MR. TREUDEN:  I didn't file those -- oh, I'm sorry.
21           THE COURT:  That's more of a statement than a
22   question.  It was rhetorical.
23           Okay.  Let's -- I don't want to belabor that point.  I
24   want to move on to a -- the next issue, having generally
25   discussed the three other factors.  And, again, you -- both
```

1    sides have done an excellent job addressing those issues in

2    their papers.

3            I want to ask just a few questions about standing,

4    although both sides, again, have done an excellent job in their

5    papers with respect to standing.

6            Ms. Davis, as it relates to -- because, of course, we

7    have two different methods that are challenged here:  One is

8    affiliating with the national party, and one is filing a

9    petition signed by 1 percent.  As to the 1 percent rule -- and

10   I'll refer to it as the 1 percent rule just for ease -- the

11   Eleventh Circuit has ruled that token attempts are enough.

12   They -- as I understand -- that's in the *Bergland* case -- for

13   the benefit of the court reporter, that's B-e-r-g-l-a-n-d -- *v.*

14   *Harris*, spelled like it sounds, 767 F.2d 1551, Eleventh Circuit,

15   1985, that a token attempt was enough for standing.  Because

16   there was a token attempt, they didn't address the issue of if

17   no attempt was made or that it was anticipated, as argued here,

18   that an attempt would be made, potentially.

19           I'm not aware of the Eleventh Circuit or the Supreme

20   Court, any controlling authority, addressing the issue of what

21   if no attempt had been made at the time of the filing.

22           Is there any such authority, Ms. Davis?

23           MS. DAVIS:  Your Honor, no attempt is significantly

24   different than a token attempt.  I would put that out there.

25           THE COURT:  Hold on.  Let's -- this will go a lot

```
 1   better if you answer my question, and then we'll go to the next
 2   thing.  I didn't ask if they were different.  I asked if there
 3   was any controlling authority on no attempt.
 4          I have a pretty good command of the King's English,
 5   and I asked a direct question, and I'd like a direct answer; and
 6   then I'll let you wax poetic about anything else you want to
 7   talk about, but I'd like you to answer my question.  And I'm
 8   going to ask Mr. Treuden to do the same thing.  I'm going to
 9   give y'all an opportunity to sum up your positions.  You've made
10   your positions plain in your papers, but when I ask questions --
11   this is the way it works in the legal system -- you answer the
12   judge's question.
13          So the question was, is there any controlling
14   authority that says there's -- addresses the no attempt?  And
15   then we are going to get into the other authority.
16          Is there any controlling authority?
17          MS. DAVIS:  The Eleventh Circuit in *Stein* addressed
18   the situation where the minor party made absolutely no attempt
19   to meet the petition method.  It was resolved on summary
20   judgment.  The Eleventh Circuit went ahead and went through the
21   entire *Anderson* analysis.
22          Past that --
23          THE COURT:  Was the issue of standing addressed in
24   *Stein*?
25          MS. DAVIS:  It was not.
```

1          THE COURT:  Would *Stein* -- since they went ahead and

2   heard it on the merits but did not address -- and I think

3   Judge Pryor recently addressed this point in an oral argument

4   involving your office.  If the Eleventh Circuit does not address

5   it, but addresses something on the merits, what is the effect,

6   if any, of that proceeding to the merits and not addressing

7   standing in terms of it being binding moving forward as it

8   relates to standing?

9          MS. DAVIS:  I don't think it would be binding as it

10  relates to standing because it wasn't addressed.  It is the

11  Court's responsibility to (inaudible) -- thank you, Your Honor.

12         THE COURT:  I understand.

13         Mr. Treuden, are you aware of any binding authority

14  that suggests no effort is enough?

15         MR. TREUDEN:  No, Your Honor.

16         THE COURT:  All right.

17         So now I'm going to give -- and, Ms. Davis, I didn't

18  mean to cut you off, but I really -- otherwise we lose our pace

19  and place.

20         So turning back, I'm now going to give you a chance --

21  and I want -- and this is -- this will be helpful -- and again,

22  you did an excellent job of briefing it.  I want to hear from

23  you as to, Judge, there's a lot of cases out there -- and a

24  number of them have been cited -- that suggest that you don't

25  have to make attempts to satisfy the ballot access requirements

```
 1    to have standing.  In fact, I think it's fair to say the

 2    overwhelming weight of authority holds that, not every case, but

 3    a substantial number of cases, but I'm not bound by them.

 4              And, Ms. Davis, I have in the past respectfully not

 5    followed some other circuits or some other district judges when

 6    I disagreed.  So it's -- I'm not suggesting that it's a numbers

 7    game, that if 20 courts have held there doesn't have to be an

 8    attempt, you lose on argument, because that's just absolutely

 9    not true.

10              I'm not interested in the number of cases.  What I'm

11    interested in is the reasoning of those cases, because the issue

12    is there's nothing binding.  So is there some persuasive

13    authority out there?

14              So I want to give you a chance -- and I'm going to ask

15    Mr. Treuden to respond -- as to, Judge, this is why I think

16    those cases are not persuasive and why the better argument is

17    the view there needs to be an attempt.  And I know you were

18    trying to do that earlier, and I appreciate that.  I just wanted

19    to make sure I wasn't missing something.

20              And I did, quite frankly, want to address the *Stein*

21    issue, because I don't think that just because the

22    Eleventh Circuit has not addressed standing but got to the

23    merits, that that's a -- then stands for the proposition that

24    they've ruled there is standing.

25              So I appreciate that, and that's why I was trying to
```

1    go through those baby steps before we get to the ultimate issue,

2    which is since there is no binding authority, is any of the

3    authority that exists persuasive?

4           So thank you.  Again, I apologize for delaying your

5    response, but I wanted to make sure we got through the other two

6    steps first.

7           You may proceed.

8           MS. DAVIS:  Thank you, Your Honor.

9           I'd go back to *Stein*.  Even though it didn't address

10   standing head on, it would be persuasive.  Given that the

11   plaintiff there did not try to meet the petition method, the

12   other court, on page 697 of the opinion, in evaluating the

13   *Anderson* test stated:  "Unfortunately, there is no direct

14   evidence on that point" of whether there was a severe burden or

15   not "because none of the party plaintiffs made any reasonably

16   diligent efforts or any efforts at all to meet Alabama's

17   signature requirement."

18          Under *Anderson-Burdick*, plaintiffs are -- have the

19   responsibility to put on direct evidence about what exactly the

20   burden is on their rights and how severe that it is.

21          Also, just because this complaint raises only

22   as-applied challenges, I think just as a matter of evaluating an

23   as-applied challenge, there would also have to be some evidence

24   of an actual burden on their rights.

25          Thank you, Your Honor.

```
 1              THE COURT:  I understand.  Thank you.

 2         Mr. Treuden?

 3         MR. TREUDEN:  What I would point out regarding Stein

 4    is that I believe that was related to the 2012 presidential

 5    election, and it was done after the election was concluded.

 6    We're in a situation here where the deadline to submit

 7    signatures has not even come upon us.  I believe that deadline

 8    is to submit signatures by July 15th.

 9              If we were to prevail on the summary judgment -- or, I

10    mean, on this preliminary injunction, and we're -- and the

11    signature amount was reduced, that may (indiscernible) the

12    candidates here to comply by the July 15th deadline, and it

13    would probably have to be -- for them to be able to do that, it

14    would have to be a significant move from the current

15    132,000-plus signatures that are required, but that is a

16    definite possibility here.

17              And I think that's relevant because in Stein the

18    summary judgment was well after the election had concluded, and

19    they had the full time period regarding that election to -- I

20    mean, they had the completed election to look at.  All the

21    actions they took, they never attempted.

22              It seems appropriate in that case where they hadn't

23    even made an attempt that it's hard to argue that they -- that

24    they would be entitled to relief on summary judgment, but here

25    the deadline hasn't passed yet.
```

1    So it depends on -- you know, when you do the -- when

2    the Court does the *Anderson* analysis and if they do decide that

3    $132,000 is -- or 132,000 signatures is too high and decides to

4    reduce it, like the *Green Party* district court case did in

5    Georgia, that would definitely put the -- might put the

6    signature requirement within the party's reach for -- but right

7    now it's more like a Mount Everest-type situation for them, and

8    so I don't think that it's fair to hold that against them by not

9    doing signature attempt as of today.

10    THE COURT:  I understand.

11    Yes, ma'am?

12    (Reporter requested clarification.)

13    THE COURT:  Ms. Davis, turning to the affiliate with

14    the national party alternative as it relates to standing, in

15    response to your arguments related to standing as it relates to

16    that method, the plaintiffs say that the -- as to one of the

17    plaintiffs that national is defined -- is defined differently

18    for the purposes of their papers -- I guess that's the Party for

19    Socialism and Liberation -- than national is for the purposes

20    that we are speaking under the Florida Statute.

21    And as it relates to the Independent Party of Florida

22    and the argument about the two methods, they say, Well, the

23    State of Florida requires us to take that out in our papers.

24    And so for purposes of standing, I understood your argument -- I

25    understand your argument, but I did want you to reply to

1    Mr. Treuden's argument as it relates to those two points as to

2    standing as it relates to affiliating with the national party.

3            MS. DAVIS:  I appreciate that.

4            In response to their reply, assuming that plaintiffs

5    have that right to not affiliate in order to get access to the

6    ballot, that right is not at all burdened here because they also

7    have the alternative access to the ballot through the petition

8    method.

9            As to what national party means in a common

10   understanding, which was the Party for Socialism and Liberation,

11   they don't put forth what that common understanding of national

12   party is, so it's difficult to analyze how that's different from

13   the national party definition in the challenged statute.

14           THE COURT:  I understand.

15           Mr. Treuden?

16           MR. TREUDEN:  Yes, I believe Ms. Davis' argument

17   regarding the Independent Party is actually going right to the

18   merits of the *Anderson* brief -- *Anderson* factors.  It's not

19   actually a standing.  The fact that they have an alternative

20   method, I mean, we acknowledge that, and I guess the real

21   question is whether it's their declaration that they intend to

22   remain independent so that they can solicit candidates that they

23   want to.

24           My understanding is that's their -- they look for --

25   and don't quote me.  I mean, it's based on my understanding.  I

1    haven't delved into this with my client, but they like to see

2    more moderate-type candidates and --

3          THE COURT:  Mr. Treuden, let me interrupt.  As I

4    understand it, for purposes of summary judgment -- you correct

5    me if I'm wrong -- if you have a declaration that explains that

6    and there's nothing to contradict it, is there any legal basis

7    for me to ignore that and come up with some alternative universe

8    of facts that I like better or that somebody else argues?

9          MR. TREUDEN:  No, Your Honor.

10          THE COURT:  And so your point is, Judge, you got the

11    declarations; there's nothing that contradicts them or contrary

12    to them; so that's what you're left with; and that's your record

13    for purposes of this hearing.  Is that correct?

14          MR. TREUDEN:  Yes.

15          THE COURT:  I understand.

16          MR. TREUDEN:  Um --

17          THE COURT:  I'm sorry.  I cut you off.

18          Anything additional on that?

19          MR. TREUDEN:  Well, regarding the Party for Socialism

20    and Liberation, I believe that the common dictionary definition

21    of a national party is what was used for their bylaws.  They are

22    associated with a national party of the same name.  It's

23    called -- well, so it's the same name.

24          So they've nominated -- the national party has chosen

25    Gloria La Riva to be their candidate, and that's who the state

121

1    party intends to nominate.  Now, they are not a national party

2    as the statute says because they don't meet the definition.  A

3    party for -- the national Party for Socialism and Liberation has

4    not filed for recognition by the FEC to be a national party, and

5    the affiliation statutes have a specific definition that

6    requires that to be considered a national party.

7           So for the statute's purposes, they are not a national

8    party and would have standing, then, to challenge their status

9    as being in the class of minor party that does not have national

10   standing.

11          THE COURT:  Let me stay with you, Mr. Treuden, and

12   turning to substantial likelihood of success on the merits, I

13   want to start with the -- briefly with the equal protection

14   claim.

15          Based on -- in terms of relief for this Court, if I

16   were to find substantial likelihood of success on the merits as

17   it relates to equal protection, would that involve eliminating

18   the one alternative -- namely, the affiliate with a national

19   party -- based on your theory that minor parties are being

20   treated differently?  Or on what basis, if I found for you on

21   that claim, would I invalidate the petition requirement?

22          MR. TREUDEN:  Yes.  Yeah, they are related.  The -- so

23   regarding the affiliation requirement, under our theory of this

24   motion in our case, we're -- we would ask the Court to strike

25   down the national association requirement and allow all minor

1   parties to proceed under the certification method of nominating

2   candidates.  And I do --

3          THE COURT:  And that's why I'm confused, Mr. Treuden,

4   so let me make sure I understand.

5          What if I found again -- and I'm not suggesting -- and

6   by the way, I'm not telegraphing to anybody.  This is truly me

7   just trying to figure out the parties' positions.

8          If I were to find there was not a substantial

9   likelihood of success on the merits as it relates to your

10  challenge to the 1 percent requirement, that is, under *Anderson*

11  I find that there's not a substantial likelihood of success,

12  but -- and I'm not suggesting I am -- but I found that there was

13  a substantial likelihood of success on the merits as it relates

14  to the equal protection claim, if I found that the affiliate

15  with a national party treated your clients differently, on what

16  basis would I strike down the 1 percent?  If everybody is

17  required to do -- file the 1 percent petition and the other

18  minor parties can't do so by affiliating with the national

19  party, wouldn't that be the end of the equal protection inquiry?

20         MR. TREUDEN:  Well, I don't think it would be -- I

21  don't think it would be right to displace the legislative -- to

22  completely strike down the affiliation requirement -- I mean,

23  the certification requirement.  We're asking the Court to allow

24  our two plaintiffs to participate as if they were national party

25  affiliated, basically to allow all minor political parties in

123

1  the State of Florida to proceed by, you know, the certification

2  that these affiliated parties are allowed to do.

3          It's very -- that would be very simple.  It's not a

4  heavy burden on any of those candidates if they do -- on any of

5  those parties to push forward and write a letter to the

6  Secretary of State certifying who their candidates are.

7          It's the -- it's a strange case.  I haven't seen any

8  other case here where there was a significant classification of

9  minor parties -- you know, between minor parties like the State

10  of Florida has done here.  So in my view, this is kind of a

11  novel issue for election law cases.

12          And so what we have here is a class of minor political

13  parties that have some sort of national support, but they may

14  have very nominal support or modicum of support in Florida, and

15  then we have Florida-only parties whose only modicum of support

16  that they have -- whatever it is, 100 percent of it is from

17  Florida because they're local parties.

18          Now, of course, that would be for the Independent

19  Party.  The Party for Socialism and Liberation does have a

20  national party, but they are not officially a national party for

21  the affiliation statute.

22          But I think it's very strange that -- you know, when I

23  was reviewing the cases yesterday, there was a case, *Munro v.*

24  *Socialist Workers Party*, that was predominant in the Secretary's

25  opposition brief.  And in that case, the Supreme Court

1    recognized that you need to show -- that it's well-established

2    that a State can require a modicum of support, and they finish

3    the sentence "among the potential voters for the office."

4            And so I believe that with regards to this affiliation

5    requirement, they're allowing a modicum of support outside of

6    the state to displace or circumvent the need for any showing of

7    a modicum of support within the state, and that's why I believe

8    that this affects both the affiliation clause and also the 1

9    percent rule, because the state legislature has basically

10   lowered the standard for modicum of support within the state by

11   allowing a significant number of candidates on the ballot that

12   don't necessarily have to show any modicum of support within

13   California -- or in Florida.

14           THE COURT:  Thank you, Mr. Treuden.

15           MR. TREUDEN:  That's why I believe it affects the

16   analysis.

17           THE COURT:  I understand.  I'm not sure it's entirely

18   responsive to the question as framed.

19           But, Ms. Davis, if you could -- And I'm going to move

20   on to the 1 percent -- I mean, the *Anderson* analysis.  I don't

21   want to spend too much time at this juncture talking about the

22   equal protection analysis.  But if you could -- you can respond

23   to Mr. Treuden's statements, if you wish, or you can do -- what

24   would be helpful -- primarily helpful to the Court is just sum

25   up, Judge, we believe that there's not a substantial likelihood

```
 1   of success on the merits as it relates to the equal protection

 2   claim and here's why.  You can do both, or you can focus on what

 3   I definitely want you to respond to, which is, Judge, here's

 4   Secretary Lee's general position as to why the equal protection

 5   claim fails.

 6            You may proceed.

 7            MS. DAVIS:  Thank you, Your Honor.

 8            The -- if the plaintiff were to win on equal

 9   protection, the affiliation method is gone and only the petition

10   method would remain.  The result is not that all minor parties

11   can just access the ballot.  This is also just because this is

12   an as-applied challenge.  Plaintiff can't --

13            THE COURT:  So, Ms. Davis -- Ms. Davis, let me ask

14   you:  So you agree with the premise of my question, not,

15   Judge -- Judge, you shouldn't do that, and they shouldn't

16   prevail on that claim, but if they did, the relief would be to

17   strike the offending provision, not the entire statute, and come

18   up with some new requirement for the whole -- you know, for the

19   whole process.  Is that correct?

20            MS. DAVIS:  That is correct.  I agree with your --

21   with the proposition in your question.

22            THE COURT:  All right.  I'm sorry.  I cut you off.

23            And, again, I understand in so stating you are in no

24   way suggesting that they're entitled to relief on the equal

25   protection claim, so I didn't mean to suggest that by the
```

```
 1   question.  But you may proceed.
 2              MS. DAVIS:  Thank you, Your Honor.
 3              The equal protection challenge should fail as a matter
 4   of law.  The basis on which plaintiffs are alleging that they're
 5   being treated differently is among the class of minor political
 6   parties.  It's not in the case of a difference of treatment
 7   between minor parties and major parties or minor parties and
 8   no-party-affiliated candidate.  That distinction is without a
 9   difference, and it doesn't rise to the level of any
10   constitutional concern.
11              THE COURT:  I understand.
12              Anything additional as to equal protection at this
13   juncture?
14              MS. DAVIS:  No, Your Honor.
15              THE COURT:  All right.  Let me turn to the *Anderson*
16   analysis under the 1 percent requirement -- actually, let me do
17   this.  It's been 40 minutes.  This is a more difficult way to
18   conduct these hearings, so I'm going to show some mercy as it
19   relates to the court reporter.  I'm going to put everybody on
20   hold for 10 minutes.  Everybody, not just the court reporter --
21   everybody is entitled to a comfort break, but we're going to
22   take a 10-minute break.
23              It's 9:41.  So we'll come back at 9:51.  And I'm going
24   to go through -- because I have a series of questions as it
25   relates to the *Anderson* analysis -- and I'm just using that as a
```

27

```
 1   shorthand.  I think everybody knows what I am referring to.  So
 2   I'm going to put you on hold, and I'll be back at 9:51.
 3              Thank you.
 4        (Recess taken at 9:41 AM.)
 5        (Resumed at 9:51 AM.)
 6              THE COURT:  Thank you for holding.
 7              Do I have my court reporter on the line?
 8              THE COURT REPORTER:  Yes, Your Honor, you do.
 9              THE COURT:  Do I have my courtroom deputy?
10              THE COURTROOM DEPUTY:  Yes, Judge.
11              THE COURT:  Mr. Treuden, are you on the line?
12              MR. TREUDEN:  Yes, I am.
13              THE COURT:  Ms. Davis?
14              MS. DAVIS:  Yes, Your Honor.
15              THE COURT:  Thank you.
16              I want to turn to the *Anderson* analysis.  I, of
17   course, recognize that the Eleventh Circuit has rejected the use
18   of a litmus paper test approach.  In fact, as I'm sure both of
19   you are aware, the Eleventh Circuit just on the 3rd, two days
20   ago, that is, June 3rd, issued a decision in -- it's Case
21   No. 19-14065, *Cowen*, C-o-w-e-n, *versus Georgia Secretary of
22   State* where they reiterate that there is not a litmus paper test
23   approach.
24              But I want to pause there, and I'll start with you,
25   Ms. Davis.  And I know that we're not playing softball, but --
```

1    so I think I know what your answer is, but I'll then give

2    Mr. Treuden a chance to respond.

3          I don't read *Cowen* as saying the prior decisions

4    related to a particular ballot order scheme are irrelevant if

5    it's been -- if a particular scheme has been -- and I don't use

6    scheme in a pejorative sense -- I mean, a structure or system

7    has previously been addressed and nothing has changed, then that

8    would be a different issue.

9          All I read -- the case law that we have no litmus

10   paper test approach recognizes that the facts can change; the

11   circumstances can change; the numbers can change; the types of

12   other restrictions that are imposed by the State can change.  So

13   things can certainly change.  You just don't say, well, at some

14   percent -- at some percentage in some other context it's

15   previously been upheld.  That isn't the end of the inquiry, but

16   I don't think it renders what's previously been reviewed

17   irrelevant, and I don't read *Cowen* as suggesting that.

18         Is that a fair reading of *Cowen* and the other cases

19   dealing with the litmus paper test approach?

20         MS. DAVIS:  Yes, Your Honor, you are correct, and

21   nothing has changed here factually to change those prior

22   opinions as to the petition method.

23         THE COURT:  And that's why I want to start,

24   Mr. Treuden, with you, because I need you to help me to

25   understand when we deal with this 1 percent -- and I under --

1   and we're going -- I've got some questions about general

2   numbers, and I know that you say that, Judge, you know, if you

3   look at our declarations and the attachments to our papers, that

4   the 132,000 -- what amounts to the 132,000-plus requirement here

5   in Florida is such a detail no minor candidate could and no

6   minor candidate with very limited exceptions -- one exception, I

7   guess you said, in California -- has overcome such a hurdle.

8          But setting that aside, I need you to address for me

9   just head on that in 1983, as I understand it, the Florida

10  requirement at that point was 3 percent, which meant that the

11  requirement was approximately 144,000, or more than the current

12  requirement, and that the Eleventh Circuit -- and, of course,

13  this is in the *Libertarian Party of Florida versus State of*

14  *Florida*, which is found at 710 F.2d 790, page 790, a 1983 case,

15  where there was a 3 percent requirement, which, as I read the

16  decision, there were also -- and I compare it to today's

17  statute, there are more alleviating factors now and fewer what

18  could be defined as suffocating restrictions and a higher

19  threshold requirement -- meaning in terms of pure numbers,

20  144,000 -- that the Eleventh Circuit upheld in the *Libertarian*

21  case in 1983 in Florida.

22          Then in 1993, while there was -- the 1 percent

23  requirement was upheld by the Eleventh Circuit.  We go from 3 to

24  1 percent, so I know the numbers are slightly lower in 1993, but

25  there were more, arguably, suffocating requirements under that

1   scheme.

2           Help me to understand in applying -- and I understand

3   it's not a litmus test.  I understand that it's not the end of

4   the inquiry just because 1 percent has previously been upheld,

5   but when I'm balancing considering likelihood of success on the

6   merits and I'm considering what the Eleventh Circuit has done in

7   the past, help me to understand if the Eleventh Circuit has

8   previously upheld a greater number of signatures with more

9   suffocating requirements and previously upheld the 1 percent,

10  albeit a slightly lower total number with more suffocating

11  requirements, how can I find here in light of those decisions

12  and those factors and the underlying facts that there's a

13  substantial likelihood of success on the merits and that there

14  is a severe burden here when under those facts the

15  Eleventh Circuit previously found and upheld there not being a

16  severe burden?

17          And I know that's -- there are multiple parts to that

18  question, but it seems to me the pretty -- that's sort of the

19  elephant in the room that we all need to address.

20          And you might -- and as you're discussing that, if you

21  could -- and I understand it's, again, just persuasive; it's not

22  the end of the inquiry, but I've also got the Ninth Circuit in

23  *De La Fuente* -- which, Madam Court Reporter, is D-e, space, L-a

24  for La, and Fuente is F-u-e-n-t-e -- *versus Padilla*,

25  P-a-d-i-l-l-a -- it was a California Secretary of State -- which

1  is found at 930 F.3d 1101, a 1 percent requirement in the

2  Ninth Circuit -- and, again, I understand it can just be

3  persuasive and not binding -- which 1 percent in California is

4  greater than 1 percent in Florida, so the total number is

5  greater; and arguably, under their scheme there are more

6  restricting requirements -- was upheld by the Ninth as not a

7  severe burden.

8          When I consider those authorities -- and what I've

9  done is I've tried to go through and create a chart of the

10 number requirements as well as the alleviating factors combined

11 with the suffocating conditions, and I've tried to compare those

12 statutes where courts have found that there are or are not

13 severe burdens.

14         And I've got to say, Mr. Treuden, I am deeply troubled

15 when I compare what -- the Florida scheme to schemes that have

16 repeatedly been found not to impose a severe burden and have

17 been upheld.  And I know it's -- I guess it's -- "suffocating

18 restrictions" has been the phrase that's been used.

19         I know there is a bunch of different parts to that

20 question.  I've given a bunch of different examples, but help me

21 to understand why you believe that there is a severe burden when

22 I consider other schemes that have -- other courts, including

23 the Eleventh Circuit on two prior occasions, have upheld as not

24 being severe burdens.

25         Counsel?  Hello?

1          Madam Court Reporter, have I lost you?

2          THE COURT REPORTER:  No, Your Honor.  I'm not hearing

3     anything.

4          MR. TREUDEN:  I'm sorry.  I started talking, and I

5     forgot to take my mute off.

6          THE COURT:  I've done that as well, Counsel.  I'm

7     going to go on mute now.

8          And, again, I know there's a lot of different parts

9     there, but -- and I'm going to, again, give you -- I know

10    there's other aspects here and other parts to this.  There is a

11    bunch of moving parts that I'd like you to focus on, and then

12    we'll -- again, I'll give everybody a sufficient chance to make

13    their other arguments.  I'm going to put you on mute -- I'm

14    going to go on mute, rather.

15         MR. TREUDEN:  All right.  Sounds good, and I hope to

16    get to the crux of our position right away.

17         The reason there's no litmus test, I believe, is

18    because you have to look at the requirement in light of the

19    statutory schema as a whole, and one of the key cases that we

20    found is *Illinois State Board of Elections versus Socialist*

21    *Workers Party* -- I cited that in one of our briefs -- 440 U.S.

22    173, a Supreme Court case from 1979.  And in that case the issue

23    was the signature requirement for the mayor of Chicago required

24    5 percent of the electorate, and -- but for a statewide

25    election, the Illinois legislature just set out a flat 25,000

 1    signature requirement.  Over time the 5 percent -- the

 2    population grew such that the 5 percent of Chicago became more

 3    than 25,000 signatures, and so they looked at the statutory

 4    schema as a whole in the state and said the legislators made a

 5    determination that in order to obtain ballot access for a

 6    statewide candidate, the signature requirement is 25,000, how

 7    can a smaller segment of the state require more and struck that

 8    statute down.

 9           And I think in this case we're not dealing with pure

10    percentages like *Illinois State Board of Elections*, but in --

11    about ten years ago when the affiliation requirement really went

12    into being, they changed the balance, I believe, in the

13    situation.  And so our argument relies, you know, heavily in

14    this situation -- because those other cases are persuasive, I

15    grant you that, regarding the upholding of percentage

16    requirements in prior cases, but here I --

17           THE COURT:  Well, Mr. Treuden, let me ask you this:

18    Do I have the numbers right that the Eleventh Circuit in

19    *Libertarian Party of Florida versus the State of Florida* in

20    1983 -- that the requirement was 144,000 plus, where it's now

21    132,000 plus, and that there were more at that point, meaning in

22    1983 -- when you compare the scheme -- or the system in 1983 to

23    present, there were more suffocating restrictions in place as it

24    relates to the requirements in Florida in 1983 than there are

25    now?  So not only --

```
 1                MR. TREUDEN:  Yes.

 2                THE COURT:  -- was the number higher, there were

 3     more --

 4                MR. TREUDEN:  Yeah.

 5                THE COURT:  -- suffocating restrictions then?

 6                MR. TREUDEN:  Yes, I believe you are correct on that.

 7                So really the crux of our argument does rely on your

 8     analysis of how adding the affiliation requirements, which, in

 9     our view, takes away -- the legislature made a choice that they

10     don't need a significant modicum of support from the state of

11     Florida in order to obtain ballot access.  The real question is

12     how does that affect the current signature requirement.  I

13     believe that was a significant change that the legislature made.

14                And, Your Honor, if a party is allowed to obtain

15     ballot access by showing national support as against -- instead

16     of local support, I think that does significantly affect the

17     signature requirement or the justification that the State says

18     they need.

19                THE COURT:  Counsel, let me -- this is what I'm trying

20     to figure out.  It sounds to me like what you are asking --

21     arguing -- and, again, I'm really not trying to be disrespectful

22     by asking it this way.  I truly want to know.

23                It sounds like you are arguing, Judge, because there's

24     a less restrictive way -- in fact, there's a less restrictive

25     way that used to exist in Florida, as you talk about the prior
```

```
 1   ease with which people could be certified -- because there is a

 2   less restrictive way, that makes this a severe limitation.  And

 3   if I misapprehend your argument, you can just let me know; but I

 4   just don't understand any legal theory that would counsel me or

 5   teach me that there's an easier way to do something that

 6   suggests that the way you're currently doing it is a severe

 7   burden within the meaning of the law.

 8           I just -- if I misapprehend your argument -- but, you

 9   know, when I distill it down, that's what I was hearing when I

10   read your brief, and that's what I'm hearing now:  Because

11   there's an easier way to do it and a less onerous way to do it,

12   that's what makes this a severe burden.  And I don't understand

13   the analysis of courts that have preceded me as approaching it

14   that way.

15           And, again, if I've got it wrong --

16           MR. TREUDEN:  Let me grab my notes here.

17           Regarding the -- I mean, we're doing all this in the

18   context of Anderson considerations, and one of the main -- I

19   think the crux of this case comes down to determining the

20   legitimacy and strengths of each of the State interests while

21   considering the extent to which those interests make it

22   necessary to burden Plaintiffs' rights.

23           And in this situation, the asserted voter confusion is

24   one of the main reasons why we are trying to limit the number of

25   people on the ballot, and I think the legislature did a
```

1   disservice towards that goal by saying, you know, we're going to

2   let someone with nominal Florida support who might have national

3   support on the ballot -- I don't see how that furthers voter

4   confusion -- or a minimization of voter confusion by -- and then

5   require someone within the state to get 132,000 signatures when

6   they relieve that requirement for someone who has national

7   support.

8           That's the crux of the argument.  I don't believe

9   that -- I believe it undermines the State's argument that voter

10  confusion -- the minimization of voter confusion is furthered by

11  the affiliation requirement because it doesn't -- it doesn't

12  seek to measure the modicum of support of Florida voters, and so

13  that's really where it comes down to.  And if --

14          THE COURT:  And I understand -- so, Mr. Treuden, let

15  me make sure I understand you.

16          Judge, we understand, as it relates to whether or not

17  there are -- when you look at the total numbers in prior case

18  law, when you look at whether or not there are alleviating

19  factors versus suffocating restrictions, that's part of the

20  inquiry, and we acknowledge that, and we acknowledge the case

21  law, and we acknowledge that there are more alleviating factors

22  here and fewer suffocating restrictions as some other state

23  schemes that have been upheld, but that's not the end of the

24  inquiry.  It's a balancing test; and when you look at the

25  overall scheme, if the goal is to show a modicum of support, if

1    the goal is to avoid confusion, we believe we've presented both

2    arguments and supporting documentation in support of those

3    arguments that would suggest that this just doesn't make any

4    sense if that's the stated interest.

5          And so when you're balancing it, Judge, it's not

6    the -- when you're considering the burden, it's not just looking

7    at it from the standpoint of are these requirements onerous;

8    it's also -- you have to also focus on the stated interest, and

9    here the stated interest is virtually nonexistent when you

10   compare to it the system that's actually in place.

11         Is that a fair characterization?

12         MR. TREUDEN:  Yeah, that's pretty much spot on.

13         THE COURT:  Okay.

14         Then turning to another couple of questions I had that

15   I want to make sure -- and I'm going to -- Ms. Davis, please

16   just make some notes because I'm going to certainly give you a

17   chance to respond to all of this.

18         When I read -- and I told you we tried to chart the

19   restrictions in place and the alleviating factors that exist.

20   When I read the *Green Party of Georgia* case that you heavily

21   relied on in your papers, which is found at 171 F. Supp. 3d

22   1340, Northern District of Georgia, *Green Party of Georgia*

23   *versus Kemp*, K-e-m-p -- formally Secretary of State, now

24   Governor of Georgia -- it seems to me that the -- again, I'm not

25   using scheme in the pejorative, but the statutory scheme at

```
 1    issue there that was struck down, it seems to me that are a lot
 2    of suffocating restrictions, and it was missing a lot of the
 3    alleviating factors that exist in this case.
 4           I know that's not the end of the inquiry.  I know it's
 5    a balancing test.  I've heard your argument about the stated
 6    interests of Secretary Lee are pure bunk.  I've got it, but I
 7    just want to -- focusing on that case, do I have that wrong when
 8    I compare the alleviating factors of the suffocating
 9    restrictions in Georgia's system versus Florida's system that's
10    at issue before me today?  Am I wrong?
11        (Pause in proceedings.)
12        THE COURT:  Mr. Treuden, you may be on mute again
13    because I'm not hearing you.
14        MR. TREUDEN:  Sorry.  I thought you said Ms. Davis at
15    the beginning of that colloquy.
16        THE COURT:  No, I wanted to ask -- because you rely on
17    that Georgia case heavily --
18        MR. TREUDEN:  Yep.
19        THE COURT:  -- it just seemed to me that it's
20    distinguishable -- when I get down into the weeds and I'm
21    comparing alleviating factors and then suffocating restrictions
22    of Florida's system versus the Georgia system, it seems like I'd
23    be mixing apples and oranges if I was to rely on that Georgia
24    case.
25        MR. TREUDEN:  Right.
```

```
1              THE COURT:  But if I've got that wrong --
2              MR. TREUDEN:  Sure.  I mean, yeah, and I think one of
3    the heavy factors that the Court relied on was the fact that
4    there hadn't been signature -- third-party signature --
5    successful ones in so long that they -- that the judges felt it
6    had to be too high.  And the Court did rely heavily on
7    Mr. Winger, our expert, as well, his affidavits about -- similar
8    to the ones that we submitted here that went to the total number
9    of signatures required as also being restrictive in their own
10   sense over and above just a pure 1 percent, because 1 percent of
11   a -- let's say, you know, a city of 10,000 people is easier for
12   a small group of people to attack and win.  And when you get
13   bigger, of course, then you have to recruit more and more, and
14   there's diminishing returns as to, you know, a core group of
15   committed people getting someone on the ballot.
16             And that's why as you get -- if you just stick totally
17   with just a percentage, it's very difficult to -- you know, it's
18   just that I don't think -- it becomes a litmus test, like they
19   said, but there are other factors.
20             Now, we didn't raise a lot of those because we still
21   haven't tried the signature campaign here, but I just point that
22   out to put -- hopefully put the Green Party case a little bit
23   more in context.  But we did --
24             THE COURT:  Let me -- let me ask a couple of follow-up
25   questions quickly.
```

1          MR. TREUDEN:  Yeah.

2          THE COURT:  As I understand it -- and, again, if I've

3     got this information wrong, correct me.  But the system at

4     issue -- and I'm using system and scheme interchangeably

5     because, again, unfortunately folks have construed in the past

6     scheme as somehow being used in some pejorative sense -- but was

7     passed in 2011; that in 2012, based on what's before me in the

8     papers, the whole issue about we don't know who is or not

9     affiliated so we just accept the filings.  In 2012 all the minor

10    parties that wanted to be on the ballot were on the ballot.

11         So as I understand it, the only track record that we

12    have for this statutory structure under Florida law was the 2016

13    election where there were four minor parties listed, and that

14    was based on affiliation.

15         So far is that correct?

16         MR. TREUDEN:  Yes, that's correct.

17         THE COURT:  And as I understand, in terms of numbers

18    and the inability -- and the number just being at some point so

19    high nobody will try, Judge, and because it's just so high

20    nobody could possibly meet that burden, the Secretary points out

21    that when you're looking at the hurdles to get petitions signed

22    and you're talking about suffocating restrictions and

23    alleviating factors, if you compare the requirements under this

24    provision for getting petitions and the ballot initiative

25    requirement under Florida law, the ballot initiative

1    requirements under Florida law are far more onerous.  And four

2    ballot initiatives are going to make their -- have garnered

3    sufficient petitions to get on the ballot.

4         What do I do with that in terms of the record before

5    me, that it can be done because it has been done?  And then I

6    would add into that the question to you that I'll need you to

7    address that -- quite frankly, I was a bit perplexed by

8    Ms. Davis' argument that the Independent Party's numbers are

9    exaggerated because they're -- people confused Independent Party

10   of Florida with true Independents or NPA, no party affiliation,

11   because you say, No, that's right, Judge; we have over 100,000

12   members.

13        So if one of your plaintiffs has over 100,000 members,

14   it suddenly -- putting things in perspective, the requirement

15   doesn't seem quite so onerous.  So when I look at that record,

16   that factual record before me, the number of people in the

17   Independent Party, as you assert, coupled with what's happened

18   with the 2020 ballot initiatives with more onerous requirements

19   as it relates to petition requirements, what do I do with that

20   in terms of the record before me in terms of the argument that,

21   Judge, this burden is just so high it's going to keep minor

22   parties off because there's no way anybody could comply with

23   such an onerous requirement?

24        I know there's a lot of questions there.  Maybe I

25   could have broken it down, but I think you know what I'm asking.

```
 1    So I'll turn it over to you, Mr. Treuden.

 2              MR. TREUDEN:  Yep, and thank you.

 3              I look at those as -- they are instructive to take

 4    note of, and, you know, I'm not going to deny that, but I do --

 5    I do believe that they're just a -- they are slightly different.

 6    So it's almost -- it's almost like comparing, you know, apples

 7    to oranges, but not completely disseparate, as I guess that sort

 8    of saying always seems to imply that they are completely

 9    different.  I don't think they are completely different.

10              But regarding initiative petitions, those are

11    generally one-issue petitions that are -- usually have something

12    to do with a hot issue that's before the electorate for whatever

13    reason, and they don't believe the legislature is acting fast

14    enough.  And so there's a very committed group of people that

15    will work on those.

16              So now when you turn to the number of people in the

17    Independent Party -- I believe that the memberships of political

18    parties are similar when you look at the major parties or the

19    minor parties, and you'll have a group that is very committed,

20    but a lot of people sign up for them merely as a political

21    statement.  And we don't -- I don't think that we have, you

22    know, 100,000 zealots that are out there every weekend trying to

23    promote the party, just like, you know, people who register as

24    Democrats or Republicans aren't doing that as well.  There are

25    going to be committed people in that group that work for
```

1   promoting the party, but there's other people in the group that

2   just want to be a member of that party, and that's it.

3          So, I guess --

4          THE COURT:  Mr. Treuden, let me stop you there.

5          MR. TREUDEN:  Yep.

6          THE COURT:  I'm going to hit the pause button for a

7   second.

8          If -- and I think the case law is pretty clear that it

9   is a legitimate interest to suggest that we want folks to have a

10  modicum of support, and that's a legitimate stated interest in

11  this case to the State of Florida and, in other cases, other

12  state governments or other entities.

13         I'm loath to understand how it helps you to argue,

14  Well, Judge, people care about legalizing marijuana, but they

15  don't really care about who's on the ballot as it relates to --

16  beyond the major two parties.

17         Doesn't that cut against the position that -- as it

18  relates to modicum of support?  It seems to me that's directly

19  contrary to the whole point of what we are exploring here.

20         MR. TREUDEN:  Well, I guess I didn't mean to come off

21  that no one cares about that, but -- and that's why I argued

22  that -- that's why I said that.  It is relevant and should be

23  considered by the Court with regards to the level of support,

24  whether petitions can pass at that level.

25         But, you know, I believe that -- I believe that they

1   are a little bit different in that most people who aren't aware

2   of a party like this and -- you know, more people are likely to

3   be aware of those hot legislative issues, I believe, and be more

4   willing to reject or sign onto those petitions.

5           So I just think they are a little bit -- they are a

6   little bit different, and they're -- looking at those are due

7   some weight, but I don't believe they are due complete weight as

8   if we were also looking at other candidate ballot access

9   petitions.

10          I think ballot access petitions -- there haven't been

11  many in the state, and I know that's -- you know, since people

12  were -- minor parties were allowed to affiliate.  And like

13  Ms. Davis said, it's -- some of the lack of that is because

14  people -- some parties are allowed to just certify their

15  candidates on the ballot.  But, yeah, I don't think -- I just --

16  I think they're due some weight, but that they're not due the

17  same amount of weight that a ballot access petition would be --

18  a history of that would be given.

19          THE COURT:  Thank you, Mr. Treuden.

20          What I want to do is pause here.

21          Ms. Davis, it would have been better for me to have

22  broken -- I know we just covered a lot -- I covered a lot of

23  material with Mr. Treuden.  But if you will, I'll now turn it

24  over to you to ask what you'd like to ask [sic] as it relates to

25  the questions that I had for Mr. Treuden and the cases and so

1    forth and the principles that I referenced.  And if I got any of

2    the information wrong in terms of the total numbers and so forth

3    or the history of the application of these different provisions

4    in Florida, please correct the record.

5              Thank you.

6              MS. DAVIS:  Thank you, Your Honor.  Just a couple of

7    quick points directed to your questions.

8              Adding the affiliation access method results in

9    greater access, not less.  In Florida parties can show that

10   important interests -- or require that important interest of

11   showing a modicum of support in one of two ways:  Either within

12   Florida through the petition method, or nationally through the

13   affiliation method, recognizing that in a presidential election,

14   the decision may very well be determined outside of Florida's

15   borders.

16             Next point:  Ballot links is not Florida's sole

17   concern, as plaintiffs' attempt to frame it.  As the Court

18   correctly noted, the interest is well-recognized and in the

19   umbrella interest of requiring the party to show that modicum of

20   support before being placed on the ballot.

21             Finally, as to *Kemp*, Your Honor is correct, the Court

22   evaluated the petition requirement, unlike the one at issue

23   here.  And also why would we look to what the Eleventh Circuit

24   has done with Georgia's petition method when we can look to what

25   it has already done with Florida in *U.S. Taxpayers* and

1    *Libertarian Party*.

2            Those are the only points I wish to make.

3            THE COURT:  I was just doing what Mr. Treuden did; I

4    started talking with the mute on.

5            Ms. Davis, if you would, before we move on -- and I'm

6    not suggesting we need to spend too much time on this, but

7    plaintiffs point out in their papers that the definition that

8    the FEC uses shows absolutely -- or demonstrates absolutely no

9    national support, that it's, quite frankly, completely

10   disconnected from showing national support, given how the FEC

11   defines a national party.

12           And if you could, I wanted you to have an opportunity

13   to reply to that.

14           MS. DAVIS:  Your Honor, thank you.

15           National interest -- the national affiliation

16   requirement is rationally related to requiring the support of --

17   showing support nationally.  It's just one factor in the

18   analysis; but after the FEC's definition, it seems to -- and

19   we've argued this in our papers -- get to the point of whether

20   that party has a showing of support nationally.  Some of the

21   factors that they rely on -- and, again, that's the FEC, not the

22   Secretary's office.  But some of those factors are whether they

23   are on a ballot in another state, whether they have grassroots

24   organizing in petition and registration efforts in other states,

25   and, as a matter of course, whether they are organized

1    nationally and other factors.  That seems to show a sufficient

2    national support.

3              THE COURT:  Ms. Davis, let me ask you this.  And I --

4    it may have -- maybe this isn't the most artful way to put it,

5    but I read into your papers basically the following statement:

6              It is connected, and, Judge, there's no requirement

7    that it be the perfect definition or the perfect system or the

8    best definition or the best system.  What it has to be is a

9    system that would be rationally related to showing national

10   support, and it does, and there is absolutely no legal

11   requirement that it be the perfect or the best way of

12   ascertaining national support.

13             Is that a fair characterization of the position in

14   your briefs?

15             MS. DAVIS:  Yes, and it's much more articulately

16   stated by you.

17             THE COURT:  All right.  Here's what we're going to do.

18   I'm going to -- y'all have -- there's a lot of layers to all of

19   these issues -- multiple issues in this case.  I'm going to go

20   ahead and -- it's been another 30 minutes -- or 40 minutes

21   almost.  We're going to take a break.

22             And when we come back -- Mr. Treuden, it's your

23   motion.  I'm not telling you I won't interrupt you or Ms. Davis

24   when you're speaking, because I know I do that, but I'm going to

25   let you -- I want you to gather your thoughts and whatever else

```
 1    you want to put on the record -- again, this case doesn't have
 2    the gaps that we normally have in a case because you did an
 3    outstanding job, as did Ms. Davis, briefing the issues.  So I
 4    don't think there are gaps in the record.
 5            But in light of my questions, in light of the comments
 6    of opposing counsel, I want both sides to be able to sum up or
 7    add anything to the record or say, Judge, I just want to circle
 8    back and make sure you don't misapprehend this argument, or I
 9    want to make plain we believe that the Court's question has
10    misdirected the issue, or whatever the case may be.  I want to
11    give you an opportunity to sum up.
12            So we are going to take a break.  It's 10:28.  We
13    will -- before we do that, though, Ms. Davis, how long would you
14    like to sum up or add information?
15            Mr. Treuden, I'm going ask you the same question.
16            MS. DAVIS:  Two minutes should be sufficient.
17            THE COURT:  And, Mr. Treuden, I'm not artificially
18    limiting either side.  I'm going to give you as much time.  It's
19    important to both of you.
20            How much time would you need, Mr. Treuden?
21            Mr. Treuden, you must be on mute.
22            MR. TREUDEN:  I'm very sorry, Your Honor.
23            THE COURT:  No worries.
24            MR. TREUDEN:  I would say about three minutes.
25            THE COURT:  I'm sorry?
```

```
 1            MR. TREUDEN:  I would estimate two or three minutes.

 2            THE COURT:  Oh, okay.  No problem.

 3            And, again, if y'all take more time, I promise I'm not

 4   going to hit a buzzer or anything, but why don't we do this -- I

 5   think it's more efficient -- we're going to come back at 10:40.

 6   Y'all can gather your thoughts.  If you have a colleague with

 7   you, talk to them.  And then, again, if it turns out you need a

 8   little bit more time -- I don't want to say a little bit more --

 9   if you need more time -- it's open ended -- that's fine.  I'm

10   not going to artificially limit anybody.  I was just trying to

11   figure out what I needed to do moving forward.

12            So we'll come back at 10:40.  Thank you.

13       (Recess taken 10:30 AM.)

14       (Resumed at 10:40 AM.)

15            THE COURT:  Thank you for holding.

16            Do I have my court reporter on the line?

17            THE COURT REPORTER:  Yes, Your Honor.

18            THE COURT:  Do I have my courtroom deputy?

19            THE COURTROOM DEPUTY:  Yes, Judge.

20            THE COURT:  Mr. Treuden?

21            MR. TREUDEN:  Yes, I am here.

22            THE COURT:  Ms. Davis?

23            MS. DAVIS:  Yes, Your Honor.

24            THE COURT:  All right.  Mr. Treuden, you have the

25   floor.  Again, I want to make plain to both you and Ms. Davis,
```

1    I'm not artificially limiting your presentation.  I know you

2    both said you need a couple of minutes, and that's fine; but if

3    you need more time, take all the time you need.

4            Mr. Treuden, I'm going to put my phone on mute.  You

5    have the floor.

6            MR. TREUDEN:  All right.  Thank you, Your Honor, and I

7    appreciate the format today.

8            I've made pretty much all the comments -- all the

9    points I wanted to make today when I prepared yesterday, and I

10   just wanted to point out one thing in response to an argument

11   that Ms. Davis made with regards to the disparate treatment of

12   the minor parties.

13           Normally in an election law case, they're looking at

14   how minor parties are treated in relation to major parties; but

15   in this situation Florida set up a statute that basically split

16   the minor parties into two groups:  There's the affiliated

17   parties and the nonaffiliated parties.

18           I just wanted to point out a case from the

19   Eleventh Circuit dealing with equal protection called *Lieb*,

20   L-i-e-b, *versus Hillsborough County Public Transportation*

21   *Commission*.  It's 558 F.3d 1301.  I just wanted to read two

22   sentences with a pinpoint of 1306.  It says:  "When legislation

23   classifies persons in such a way that they receive different

24   treatment under the law, the degree of scrutiny the court

25   applies depends upon the basis of the classification."

1          And:  "If a law treats individuals differently on the

2     basis of race or another suspect classification, or if the law

3     impinges on a fundamental right, it is subject to strict

4     scrutiny."

5          We don't have a case where we're dealing with race or

6     another suspect classification, but because the sole determining

7     factor that splits these two groups of minor political parties

8     is their -- who they associate with, whether it's nationally or

9     not or -- and such.  I do believe that it does impinge on a

10    fundamental right.

11         Now, *Lieb* was not an election law case, so we can't

12    just flat out say that strict scrutiny applies.  You have to

13    apply the *Anderson* factors, and severe burdens require strict

14    scrutiny.  And so the question, I believe, comes down to whether

15    the restriction -- the regulation is a reasonable

16    nondiscriminatory burden.  *Anderson* says that's usually okay;

17    and if the Court finds that, then they would probably uphold the

18    statute.

19         And lesser burdens, of course, trigger less exacting

20    review.  But when you compare the two groups' burdens, one which

21    requires ballot access -- or allows ballot access by a mere

22    certification -- when you compare that to attempting to get

23    132,000 signatures, the burdens are quite disparate.

24         So that's the only point that I wanted to make.  I

25    believe that all my other points were adequately addressed

```
 1   during the hearings.

 2           So thank you.

 3           THE COURT:  Thank you, Counsel.

 4           Ms. Davis?

 5           MS. DAVIS:  Thank you, Your Honor, and thank you for

 6   providing this forum for us today.

 7           Florida's alternative access methods do not and have

 8   not frozen the status quo such that voters lack a choice outside

 9   of the two major parties, and because voters can and do have

10   that choice, the burden on plaintiffs' access rights is not

11   severe.  Therefore, Florida's well-recognized interest flowing

12   from that showing of a modicum of support should be sufficient.

13           That showing of support in Florida can be made one of

14   two alternative ways.  You can show modicum of support within

15   Florida through the petition method, which would be appropriate

16   for parties like plaintiffs who want to remain as single-state

17   parties; or you can show the support nationally, recognizing

18   that to some extent presidential elections may be determined

19   outside of Florida's borders, and for that showing you can

20   affiliate with a national party or be nationally affiliated.

21           The Secretary asks this Court to deny plaintiffs'

22   motion for preliminary injunction.  If this Court does not first

23   grant her motion to dismiss, then I think we've covered all of

24   the particular topics that we wanted to hit for the Court.

25           So that is it for my presentation, Your Honor.  Thank
```

1    you.

2            THE COURT:  I thank you, Ms. Davis and Mr. Treuden,

3    for your professionalism and hard work on this case.  I

4    understand the importance of moving this case forward

5    expeditiously.

6            I have had a preliminary injunction on an issue

7    related to a challenge to a local law on Wednesday; I have this

8    today; and I've got another preliminary injunction hearing next

9    week.  I'm going to do my best to get out an order sometime next

10   week, Monday, Tuesday, Wednesday -- probably Wednesday, but I'll

11   do my best to get an order out quickly.  I am not going to sit

12   on this case.  I want whichever party does not agree with my

13   order on the preliminary injunction to have a meaningful

14   opportunity to appeal.  So I'll do my best to get out something

15   next week as I prepare for some other emergency matters.

16           Again, I apologize for the delay.  It will take me a

17   few days to get an order out, but thank you for your hard work

18   and professionalism.

19           Court is in recess.

20           MS. DAVIS:  Thank you, Your Honor.

21           MR. TREUDEN:  Thank you.

22      (Proceedings concluded at 10:46 AM on Friday, June 05,

23   2020.)

24

25

1       * * * * * * * *

2    I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.

3 Any redaction of personal data identifiers pursuant to the
Judicial Conference Policy on Privacy is noted within the

4 transcript.

5

6 /s/ Megan A. Hague     6/10/2020

7 Megan A. Hague, RPR, FCRR, CSR  Date
  Official U.S. Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Tab C

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 13th day of July, 2020, a true copy of the foregoing was served via transmission of a Notice of Electronic Filing through the Court's CM/ECF system to all counsel of record.

*/s/ Ashley E. Davis*
ATTORNEY